**John DOE et al., Appellants,**

**v.**

**John L. McMILLAN et al.**

**No. 71–1027.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 7, 1971.

Decided Jan. 20, 1972.

Certiorari Granted June 26, 1972. See 92 S.Ct. 2505.

See also, 143 U.S.App.D.C. 157, 442 F.2d 879.

Mr. Dennis Dutterer, Washington, D. C., with whom Mrs. Jean Camper Cahn and Mr. J. Kirkwood White, Washington, D. C., were on the brief, for appellants.

Mr. David P. Sutton, Asst. Corporation Counsel for District of Columbia, for District of Columbia appellees. Messrs. C. Francis Murphy, Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, also entered appearances for District of Columbia appellees.

Mr. John A. Terry, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, Joseph M. Hannon, Asst. U. S. Atty., Fred M. Vinson, Jr., William C. Cramer, Michael P. Bentzen, Sheldon S. Gilbert, Richard M. Haber, and James S. Rubin, Washington, D. C., were on the brief, for Federal appellees.

Before WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

Plaintiff-appellants in this case are a class of persons composed of students at Jefferson Junior High School in the District of Columbia and their parents and guardians. Defendant-appellees are: (1) The Chairman and Members of the House of Representatives Committee on the District of Columbia[1]; (2) the Clerk, Staff Director, Counsel and a consultant to the Committee; (3) the Superintendent of Public Documents and the Public Printer, i. e., the Government Printing Office; (4) the President and Members of the Board of Education of the District of Columbia; (5) the Superintendent of the Public Schools of the District of Columbia; (6) the Principal of Jefferson Junior High School; (7) a teacher at Jefferson Junior High School; (8) a District of Columbia Police Officer acting as an investigator for the Committee; and (9) the United States of America.

Appellants, proceeding *in forma pauperis* and under fictitious names to preserve their anonymity, commenced this action in the District Court for damages, a declaratory judgment and for an injunction against further publication and distribution of a report of the House of Representatives Committee on the District of Columbia on the District of Columbia School System[2] unless 45

1. Although the complaint initially named all of the Members of the House District Committee as defendants, we subsequently granted appellants' motion to sever Congressmen Brock Adams, Charles C. Diggs, Jr., Donald M. Fraser, Gilbert Gude, and Andrew Jacobs, Jr., and to dismiss this appeal with respect to them. June 7, 1971. The stipulation upon which such dismissal was based, indicated that the above-named Congressmen oppose the distribution of the House Committee Report, so long as the names complained of remain therein, and that they would have voted against the publication thereof had they been given the opportunity to do so.

2. Investigation and Study of the Public School System of the District of Columbia (Report of the Committee on the District of Columbia, House of Representatives), H.R.Rep. No. 91–1681, 91st Cong., 2d Sess. (December 8, 1970). This report was prepared pursuant to a House Resolution, H.Res. 76, 91st Cong., 1st Sess. (February 5, 1969), which provides:

> *Resolved*, That the Committee on the District of Columbia, acting as a whole or by subcommittee, is authorized to conduct a full and complete investigation and study of the following:
>
> (1) the organization, management, operation, and administration of any department or agency of the government of the District of Columbia;
>
> (2) the organization, management, operation, and administration of any independent agency or instrumentality of government operating solely in the District of Columbia; and

pages thereof were altered to delete certain names of students. The pages in question contain copies of: (1) student absentee lists; (2) letters, memoranda, and other papers regarding student disciplinary problems; and (3) student test papers.[3] These documents, which include the true names and addresses of appellants, identify the students in contexts that are, at least partially, derogatory. Appellants contend, *inter alia,* that the disclosure, dissemination, and publication of the House Committee Report, so long as it contains the names of said students, violate their constitutional and common law right to privacy, constitute an impermissible bill of attainder, deny them due process of law, violate the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1970), are devoid of any valid legislative purpose, and will cause severe damage to their mental and physical health, their reputations, and appellant-students' future careers. They also make a contention on appeal which was not raised below, namely, that the House Committee Report was published and distributed in violation of House rules.

The District Court denied appellants' motion for temporary relief and dismissed their complaint. It found that the House Committee Report had a "legitimate and proper legislative purpose," as demonstrated by the underlying enabling resolution,[4] and it held that it was without jurisdiction to grant the requested injunctive relief by reason of the doctrine of separation of powers. It further determined that since the acts of the Legislative Branch employees named as defendants were performed by them in the course of their employment, they were absolutely privileged under the doctrine of official immunity. The District of Columbia defendants were found to be protected by the doctrine that a public officer cannot be liable in money damages, even if he has acted negligently, so long as his act was discretionary. Finally, the District Court concluded that it lacked jurisdiction over any claim against the United States, since appellants had not exhausted their other remedies as required by 28 U.S.C. § 2675(a) (1970).[5] This appeal followed.

(3) those operations or activities directly affecting the District of Columbia, of any governmental agency or instrumentality operating on a regional basis entirely within the Washington metropolitan area: *Provided,* That the Committee shall not undertake any investigation of any subject which is being investigated by any other committee of the House.

For the purpose of carrying out this resolution the committee or subcommittee is authorized . . . to hold such hearings, and to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents, as it deems necessary . . .

The committee shall report to the House as soon as practicable during the present Congress the results of its investigation and study together with such recommendations as it deems advisable. Any such report which is made when the House is not in session shall be filed with the Clerk of the House.

\*　　\*　　\*　　\*　　\*

Counsel for appellants indicated at oral argument in the District Court that he does not contend that the House District Committee acted pursuant to an invalid legislative purpose in investigating the District of Columbia Public School System and publishing the Report (Tr. 23, 24, 27), but he does seek declaratory and injunctive relief against the Committee as well as others. Art. I, § 8, cl. 17, of the U. S. Constitution vests Congress with the power of "exclusive legislation" over the District of Columbia. *See* note 6, *infra.*

3. This information was obtained voluntarily from District of Columbia school personnel by House District Committee investigators. Before the District Court below, appellants unsuccessfully sought an injunction against further disclosure of such "confidential information" by District of Columbia school officials.

4. H.R.Res. 76, *supra* note 2.

5. 28 U.S.C. § 2675(a) provides:
 An action shall not be instituted upon a claim against the United States for money damages for injury or loss

Appellants moved this court for summary reversal or an injunction pending appeal. On January 14, 1971, we issued an injunction to preserve the status quo until responses were filed. Such order did not enjoin the Members of the House District Committee or the United States, but it did prohibit the other defendant-appellees from any further publication and distribution of the House Committee Report, so long as it contained the names and addresses of pupils and parents. On March 11, 1971, this court denied appellants' motion for summary reversal, and appellees' motion for summary affirmance, and it modified the injunctive order of January 14, 1971, to permit the publication of names of students absent from school. It otherwise continued the injunction and ordered the case set for argument on an expedited basis.

The issues have now been briefed and argued, and we hold that the District Court's dismissal was proper. For the reasons set out below, we have concluded that the District Court was without jurisdiction with respect to the defendant-appellees. Therefore, we have not found it necessary to consider the merits of the constitutional, statutory, administrative, and common law claims which appellants have asserted.

**I**

Under Article I, Section 8 of the Constitution, Congress is provided with exclusive legislative authority over the District of Columbia.[6] This pervasive power is accompanied by inherently broad investigatory authority.

Preliminary inquiry has from the earliest times been considered an essential of the legislative process. By it are to be determined both the advisability for and the content of legislation. So that even as to ordinary subjects, the power of inquiry by the legislature is coextensive with the power of legislation and is not limited to the scope or the content of contemplated legislation. Constitutional legislation might ensue from information derived by an inquiry upon the subject described in the [investigating body's legislative authorization.] That potentiality is the measure of the power of inquiry.

Barsky v. United States, 83 U.S.App.D. C. 127, 131, 167 F.2d 241, 245, cert. denied, 334 U.S. 843, 68 S.Ct. 1511, 92 L. Ed. 177 (1948). See Fields v. United States, 82 U.S.App.D.C. 354, 164 F.2d 97 (1947), and authorities cited therein; McGrain v. Daugherty, 273 U.S. 135, 177–179, 47 S.Ct. 319, 71 L.Ed. 580 (1927). "The scope of the power of in-

---

of property or personal injury or death caused by the negligent or wrongful act or . omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

Appellants have not challenged the District Court's dismissal of the suit against the United States on appeal.

6. U.S.Const. art. I, § 8 provides:
"The Congress shall have Power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, . . . ." See S. R. A., Inc. v. State of Minn., 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851 (1946); Gudmundson v. Cardillio, 75 U.S.App.D.C. 230, 126 F. 2d 521 (1942); La Forest v. Board of Commissioners of District of Columbia, 67 App.D.C. 396, 92 F.2d 547, cert. denied, 302 U.S. 760, 58 S.Ct. 367, 82 L.Ed. 588 (1937).

quiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." Barenblatt v. United States, 360 U.S. 109, 111, 79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115 (1959). *See* Watkins v. United States, 354 U.S. 178, 187, 198, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957).

The instant case concerns an investigation of the District of Columbia Public School System which was conducted on behalf of the Committee on the District of Columbia of the House of Representatives, by a Special Select Subcommittee of that House District Committee, under the authority of H.R.Res. 76, 91st Congress, 1st Session.[7] The study probed deeply into a great many problems of the District of Columbia School System. Included were: Administrative Problems, Board of Education of the District of Columbia, Crime in the Schools, D.C. School's Answer to Special Select Subcommittee Questions, Pornography, Revolutionary and other Inflammatory Materials, Damage to Property, Drug Abuse in the Schools, School Budget, Washington Teachers Union, Student Bussing, Student Suspension Policy, Schools without Walls, Open Class Rooms, Open Class Room Concept, Freedom School, Vocational Schools, Student Bill of Rights and Responsibilities and Teacher Comments. A portion

of the study related to absenteeism, student discipline, and educational quality. On these matters, the 45 pages from 213–258 set forth for Jefferson Junior High School various absence sheets, lists of class cutters and certain reports and information concerning breaches of discipline and suspension problems. Also included were 19 pages of student test papers for a history examination taken from a fifth grade textbook but given to seventh graders. The average score was "F" and the report was submitted by the teacher to show the poor reading ability of most of her students.

■■ At the conclusion of the investigation, the House Committee issued a 450-page Report, both for the benefit and use of Congress and for the information of the public. The material to which appellants object is only a small part of the entire Report. The Report in its entirety discloses a truly deplorable state of affairs in the public schools of the District of Columbia and obviously one of tremendous congressional concern.[8] Appellants do not challenge the propriety of the investigation or the issuance of the Report generally—*i. e.,* absent the use of their names—nor could they.[9] They only assert a statutory, common law, and constitutional right to anonymity. We need not discuss the merits of appellants' innovative claims,

7. *See* note 2, *supra.*

8. For the fiscal year ending June 30, 1970, Congress appropriated $140,386,-000 for public education in the District of Columbia (83 Stat. 429). Further evidence of the vital interest of Congress in the current District school situation can be deduced from a letter of the President of the Board of Education appearing at pp. 16–19 of the Report which indicates that a grand total of $10,022,041 in additional appropriations will be needed "to create a safe learning environment for its students as determined by the school administration and the Board of Education."

9. In light of the vast amount of tax dollars spent annually on public education in the District of Columbia, the great interest of the public in the effectiveness of the District schools is apparent. It

must be emphasized that "[t]he effective functioning of a free government like ours depends largely on the force of an informed public opinion. This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees." Barr v. Matteo, 360 U.S. 564, 577, 79 S.Ct. 1335, 1342, 3 L.Ed.2d 1434 (1959) (concurring opinion of Black, J.). "The informing function of Congress should be preferred even to its legislative function." Watkins v. United States, 354 U.S. 178, 200 & n. 33, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957). The fact that an educational institution was being investigated did not detract from Congress' general authority. *See* Barenblatt v. United States, 360 U.S. 109, 112, 129, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

however, since we conclude that all of the defendant-appellees named in the complaint are immune from the suit brought against them.[10]

## II

Article I, Section 6 of the Constitution provides that "for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other place." This provision, which was adopted by the Constitutional Convention without debate or opposition,[11] found its roots in the conflict between Parliament and the Crown culminating in the Glorious Revolution of 1688 and the English Bill of Rights of 1689.[12] In light of this histo-

---

10. Appellants have raised an issue, concerning alleged violations of House Rules, in their appeal brief which was never raised in the District Court. We dismiss this portion of the appeal on the ground that it was not properly asserted below. Miller v. Avirom, 127 U.S.App.D.C. 367, 384 F.2d 319 (1967); United States v. Atkinson, 297 U.S. 157, 159, 56 S.Ct. 391, 80 L.Ed. 555 (1936); Johnston v. Reily, 82 U.S.App.D.C. 6, 7, 160 F.2d 249, 250 (1947); United States v. United States Fidelity & Guaranty Co., 236 U.S. 512, 529, 35 S.Ct. 298, 59 L.Ed. 696 (1915); Williams v. Union Pacific Ry. Co., 286 F.2d 50, 55 (9th Cir. 1960); Burns v. United States, 274 U.S. 328, 336, 47 S.Ct. 650, 71 L.Ed. 1077 (1927). We do not believe that appellants have demonstrated the existence of any exceptional circumstances which might warrant divergence from this general principle. *Compare* Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); Morgan v. Garris, 113 U.S.App.D.C. 222, 223, 307 F.2d 179, 180 (1962) (*en banc*). "This is not a mere technicality but is of substance in the administration of the business of the courts. Enormous confusion and interminable delay would result if counsel were permitted to appeal upon points not presented to the court below. Almost every case would in effect be tried twice under any such practice. While the rule may work hardship in individual cases, it is necessary that its integrity be preserved." Johnston v. Reily, *supra*, 82 U.S.App.D.C. at 7, 160 F.2d at 250.

A large part of appellants' argument, which is raised here for the first time, is devoted to the claim that they were entitled under Rule XI, 27(m) of the Rules of the House of Representatives, to have the evidence with respect to them received in executive session. Their argument further assumes that such procedure would have resulted in suppressing disclosure of the statements. However, an express determination by the "Committee" is required before it is necessary to convene an executive session of the Committee and no such determination was here made. Also, it is implicit from a reading of Rule XI, 27(o) that the taking of testimony in executive session does *not* automatically result in its suppression. It provides:

"(o) No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the committee."

Jefferson's Manual and Rules of the House of Representatives, p. 387, 92nd Cong. It thus appears that the Committee may still consent to the release of any such evidence or testimony and to its use in public sessions.

Appellants also contend that under the Rules of the House the Report was improperly released without allowing certain Congressmen to express a minority view. It does appear, however, that some of the Congressmen were orally informed. In any event, the delivery of the Report to the Clerk for printing and reference to the proper calendar under Cl. 2 of Rule XIII were reported in the Congressional Record for December 8, 1970 and the Report was on that date referred to the whole House on the State of the Union and ordered to be printed (116 Cong.Rec. 40311). Such points of order must be raised by a member in the House of Representatives and unless done so in timely manner are waived. Appellants thus do not furnish a basis that justifies ordinary judicial intervention.

11. *See* 5 Debates on the Federal Constitution 406 (J. Elliot ed. 1876); 2 Records of the Federal Convention of 1787, p. 246 (M. Farrand rev. ed. 1966).

12. *See* Cella, The Doctrine of Legislative Privilege of Freedom of Speech and Debate: Its Past, Present and Future as a Bar to Criminal Prosecutions in the Courts, 2 Suffolk U.L.Rev. 1, 3–16 (1968); Yankwich, The Immunity of Congressional Speech—Its Origin, Meaning and Scope, 99 U.Pa.L.Rev. 960, 961–966 (1951).

It is significant that legislative freedom was so carefully protected by constitutional framers at a time when even Jef-

ry, the Supreme Court concluded in United States v. Johnson, 383 U.S. 169, 181, 86 S.Ct. 749, 755, 15 L.Ed.2d 681, (1966), that the purpose of the Speech or Debate Clause was "to prevent intimidation [of legislators] by the executive and accountability before a possibly hostile judiciary."

"In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense." [13] To accomplish this important objective, the Supreme Court has recognized the necessity for construing the Speech or Debate Clause protection in a broad fashion. Kilbourn v. Thompson, 103 U.S. 168, 204, 26 L.Ed. 377 (1881); United States

v. Johnson, 383 U.S. 169, 179–180, 86 S. Ct. 749, 15 L.Ed.2d 681 (1966). "[I]t would be a 'narrow view' to confine [its] protection . . . to words spoken in debate. *Committee reports,* resolutions, and the act of voting are equally covered, as are 'things generally done in a session of the House by one of its members in relation to the business before it.' Kilbourn v. Thompson, *supra,* at 204." Powell v. McCormack, 395 U.S. 486, 502, 89 S.Ct. 1944, 1954, 23 L.Ed.2d 491 (1969) (emphasis supplied).[14]

■■■ The Speech or Debate Clause not only provides a defense on the merits, but it generally protects a legislator from the annoyance of having to devote his time and efforts to defending himself in court. Powell v. McCormack, *supra,* 395 U.S. at 502–503, 89 S.Ct. 1944. *See* Dombrowski v. Eastland, 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).[15] The only question which a

---

ferson expressed fear of legislative excess. [See Jefferson, Notes on the State of Virginia (3rd Am. ed. 1801), 174–175.] For the loyalist executive and judiciary had been deposed, and the legislature was supreme in most States during and after the Revolution. "The legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex." Madison, The Federalist, No. XLVIII.
Tenney v. Brandhove, 341 U.S. 367, 375, 71 S.Ct. 783, 787, 95 L.Ed. 1019 (1951).

13. 2 Works of James Wilson (Andrews ed. 1896) 38, as quoted in Tenney v. Brandhove, *supra,* 341 U.S. at 373, 71 S.Ct. at 786.

14. The Supreme Court has frequently cited the language of Chief Justice Parsons, of the Massachusetts Supreme Court, in Coffin v. Coffin, 4 Mass. 1, 27 (1808), interpreting the Massachusetts speech and debate clause, in support of its expansive interpretation rule:
These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal. I therefore think that the article ought not to be construed

strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate; but will extend it to the giving of a vote, *to the making of a written report,* and to every other act resulting from the nature, and in the execution, of the office; and I would define the article as securing to every member exemption from prosecution, for every thing said or done by him, as a representative, in the exercise of the functions of that office, without inquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules. [emphasis supplied]
Tenney v. Brandhove, *supra,* 341 U.S. at 373–374, 71 S.Ct. at 787; Kilbourn v. Thompson, *supra,* 103 U.S. at 203.

15. The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of

trial court should consider is "whether from the pleadings it appears that the [legislators] were acting in the sphere of legitimate legislative activity." Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951). Since we believe that the activities of the defendant-members of the Committee on the District of Columbia of the House of Representatives "may fairly be deemed within [the Committee's] province," it is clear that the District Court properly dismissed the suit as to them. *Id.*, at 378, 71 S.Ct. at 789. *See* United States v. Doe, 455 F.2d 753, 757 (1st Cir. 1972).

■ As has been noted, appellants concede the authority of the House District Committee to investigate and report to Congress on the District of Columbia Public School System. They have only questioned the propriety of that small portion of the Committee Report which uses their names in somewhat derogatory contexts. "That the protection of private rights upon occasion involves an invasion of those rights is in theory a paradox but, in the world as it happens to be, is a realistic problem requiring a practical answer." Barsky v. United States, *supra*, 83 U.S.App.D.C. at 135, 167 F.2d at 249. It is apparent that the House District Committee was faced with a great dilemma. In its effort to expose the vexing problems which adversely affect the District of Columbia School System, with a view toward the alleviation of such problems to the benefit of all school children, the Committee obviously believed that some disclosure which might possibly injure a few pupils was necessary. While there may or may not be any substantial public interest in

the test papers, discipline memoranda, or absentee lists themselves, the inclusion of such material in the Committee Report clearly increased its credibility. While some might consider that it was unnecessary to include the names, at a time such as this when "credibility gaps" are frequently mentioned, it was entirely reasonable for the House District Committee to include what it considered to be sufficient factual data to support its findings concerning a controversial and complex area. Delinquency in the District of Columbia Schools is such a problem and in connection with its investigation of the Student Suspension Policy, which it was investigating, Congress had a right to know the precise details of a few particular disciplinary problems involving the discipline of particular students for particular acts committed in the class rooms of the public schools of the District. All the details of such circumstances, including the names of the students involved and their acts were relevant and necessary for a full and proper consideration of the matter. Many of the instances of student delinquency which one hears daily are considered by many to be unbelievable. Others assert they are untrue. Under such circumstances the desire of the Committee to present specific evidence to support its findings is understandable. And the discretion is vested in Congress, not the courts. We must be careful to remember that under such circumstances, "every reasonable indulgence of legality must be accorded to the actions of [the] coordinate branch of our Government" by the judiciary. Watkins v. United States, *supra*, 354 U. S. at 204, 77 S.Ct. at 1188.[16]

this Court in Fletcher v. Peck, 6 Cranch 87, 130 [3 L.Ed. 162], that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned. See cases cited in [State of] Arizona v. [State of] California, 283 U.S. 423, 455, [51 S.Ct. 522, 526, 75 L.Ed. 1154].

Tenney v. Brandhove, *supra*, 341 U.S. at 377, 71 S.Ct. at 788.

16. "[I]t does not lie with this Court to say when a congressional committee should be deemed to have acquired sufficient information for its legislative purposes." Hutcheson v. United States, 369 U.S. 599, 619, 87 S.Ct. 1005, 1015, 8 L.Ed. 2d 137 (1962). Similarly, this court should not interpose its judgment for that of a congressional committee with respect to the amount of data required to bolster the credibility and effectiveness of a committee report.

What is really involved here is Congress functioning as it must with respect to the District of Columbia, as a combination state legislature and education committee that is concerned with a grass roots problem. As with any local school board problem, this involves individuals, administrators, teachers, employees, parents, students and taxpayers. The Report recognizes this and to make its study complete and to give it the maximum credibility, the Report throughout, in hundreds of situations in addition to the students involved in disciplinary problems, has named the persons involved. The Report is replete with names of individuals, groups and organizations, many of which are discussed in connection with highly derogatory conduct. For instance, in reporting on the narcotics situation, names and incidents are recited of employees who were furnishing narcotics to drivers employed by the schools. H.R.Rep. No. 91–1681, 91st Cong., 2d Sess. 109–110 (1970). Appellants are not singled out. They are a minor part of the Report. However, it must be noted that the use of specific names throughout the Report does add considerably to its credibility in an area where reliability is necessary.

"Our function, at this point, is . . not to pass judgment upon the general wisdom or efficacy of the activities of this Committee in a vexing and complicated field." Barenblatt v. United States, *supra*, 360 U.S. at 125, 79 S.Ct. at 1092. It is merely to determine whether the defendant-legislators were acting within the sphere of their legitimate activity when they collected the in-

formation in question and issued the House Committee Report in its present form. Since it is readily apparent that their actions were within the discretionary area of their constitutional authority, the defendant-Representatives are absolutely protected by the Speech or Debate Clause.

### III

 The legislative immunity provided by the Speech or Debate Clause is not limited to Congressmen, although the doctrine's protection "is less absolute . . . when applied to officers or employees of a legislative body, rather than to legislators themselves." Dombrowski v. Eastland, *supra*, 387 U.S. at 85, 87 S.Ct. at 1427. *See* Tenney v. Brandhove, *supra*, 341 U.S. at 378, 71 S.Ct. 783. Therefore, when congressional employees or officers are acting pursuant to valid [17] legislative authorization, in furtherance of a proper legislative purpose, they also come within the scope of the Speech or Debate Clause protection. *See* United States v. Doe, 455 F.2d 753, 761 (1st Cir. 1972).

There is no contention by appellants that any of the Federal legislative employees named as defendants [18] were acting outside the sphere of their official duties. They merely performed the incidental functions which were necessary to insure the full accomplishment of the House District Committee's appropriate legislative objective. In this day of complex public problems, where assignment of authority by legislators to legislative assistants is an absolute necessity if Congress is to be able to perform its

17. *Compare* Kilbourn v. Thompson, 103 U. S. 168, 26 L.Ed. 377 (1881); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); and Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L. Ed.2d 235 (1966), where the underlying authorizations were invalid. Since the House District Committee's enabling resolution was clearly valid, as appellants have conceded, the holdings in these cases are inapposite to the present situation. The scope of the House District Committee's inquiry into the District of Colum-

bia Public School System was properly limited and defined, and no compulsory process was utilized. Thus the rationale of Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), is not relevant here. *See* Hutcheson v. United States, 369 U.S. 599, 613 n. 16, 616, 82 S.Ct. 1005, 8 L.Ed.2d 137 (1962).

18. These include the Clerk, Staff Director, Counsel, and consultant to the Committee, its investigator, the Superintendent of Public Documents and the Public Printer.

constitutional functions, it would indeed be hollow to afford immunity to the Congressmen, but not to their assistants, for these aides might be hesitant to undertake the full performance of their lawful duties if they had to face the threat of possible lawsuits. Such an inconsistent result would impossibly hinder congressional activities, and effectively prevent the attainment of the objectives underlying the Speech or Debate Clause. We therefore must conclude that the suit against the Federal legislative employees [19] was properly dismissed due to their legislative immunity.

Although we could base our decision regarding the Federal legislative employees wholly on the protection afforded them by the Speech or Debate Clause, an additional consideration further demonstrates why the District Court properly refused to enjoin the publication and distribution of the House Committee Report by them. "If a court could say to the Congress [, and we might add to its authorized agents,] that it could use or could not use information in its possession, the independence of the Legislature would be destroyed and the constitutional separation of the powers of government invaded. Nothing is better settled than that each of the three great departments of government shall be independent and not subject to be controlled directly or indirectly by either of the others." Hearst v. Black, 66 App.D.C. 313, 316–317, 87 F.2d 68, 71–72 (1936). In Methodist Federation for Social Action v. Eastland, 141 F.Supp. 729 (D.D.C. 1956), a decision of a three-judge court, Judge Edgerton speaking for himself and Judge Prettyman said:

> Nothing in the Constitution authorizes anyone to prevent the President of the United States from publishing any statement. This is equally true

whether the statement is correct or not, whether it is defamatory or not, and whether it is or is not made after a fair hearing. Similarly, nothing in the Constitution authorizes anyone to prevent the Supreme Court from publishing any statement. We think it equally clear that nothing authorizes anyone to prevent Congress from publishing any statement.

> \* \* \* \* \* \*

> [Courts] have no more authority to prevent Congress, or a committee or public officer acting at the express direction of Congress, from publishing a document than to prevent them from publishing the Congressional Record. If it unfortunately happens that a document which Congress has ordered published contains statements that are erroneous and defamatory, and are made without allowing the persons affected an opportunity to be heard, this adds nothing to our authority. Only Congress can deal with such a problem.

141 F.Supp. at 731–732. *See* Hobson v. Tobriner, 255 F.Supp. 295 (D.D.C.1966).

In light of the assurance provided this court by the Federal appellees that the Chairman and Members of the House District Committee, as presently constituted in the 92d Congress, have no intention of seeking republication or further distribution of the House Committee Report,[20] we believe that the admonition provided by this court in Cole v. McClellan, 142 U.S.App.D.C. 24, 26, 439 F.2d 534, 536 (1970), is highly relevant:

> Judicial restraint is certainly proper in a case like the one before us, where the salient factors, taken in conjunction with each other, reveal (a) information delivered to the committee without objection or protest, (b) only the vaguest allegations of anticipated

---

19. Although it might be possible to extend the protection of the Speech or Debate Clause to cover the District of Columbia officials and employees who cooperated with the House District Committee's investigation, we need not reach this complex issue, due to the official immunity doctrine discussed in Part IV of this opinion. The parties have not argued this point, and we believe that its resolution is best left to another time. *Compare* United States v. Doe, 455 F.2d 753, 761 (1st Cir. 1972).

20. Brief for Federal Appellants at 20 n. 44.

harm—a hypothetical speculation that at some indeterminate future occasion [appellants might suffer some injury] . . . ; and (c) a lack of any showing of current activity by the committee staffs which constitute, as to the class of plaintiffs, an actual threat along such lines, or which otherwise give immediacy to the claim that constitutional freedoms are being infringed or jeopardized.

It is clear that the information in question was provided the legislative investigators by the District of Columbia school officials without objection or protest. In view of the fact that the Report had already been published and distributed before this action was instituted and that appellants have only asserted vague allegations of anticipated harm at some indefinable future time, we believe that the court below exercised appropriate judicial restraint in dismissing that part of appellants' complaint which sought the enjoining of the publication and dissemination of the House Committee Report. Any other determination would have caused needless friction between separate and independent departments of the Federal Government.

### IV

 We also decide that all of the District of Columbia defendant-appellees,[21] as well as the Federal legislative employees named in the complaint,[22] are protected from liability[23] in the instant case by the doctrine of official immunity.

Unlike the constitutionally based Speech or Debate Clause protection, the law of privilege as a defense by governmental officials to civil suits has in large part been of judicial making. Barr v. Matteo, 360 U.S. 564, 569, 79 S. Ct. 1335, 3 L.Ed.2d 1434 (1959). The courts have recognized that "officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Id.*, at 571, 79 S.Ct. at 1339. The basic rationale for this doctrinal approach was excellently expressed by Judge Learned Hand in Gregoire v. Biddle, 177 F.2d 579, 581 (2nd Cir. 1949) :

It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for

21. These include the President and Members of the Board of Education, the Superintendent of the Public School System, and the Principal and teacher at Jefferson Junior High School.

22. Although we concluded in Part II of this opinion that the Federal legislative employees are protected by the Speech or Debate Clause coverage, it is apparent that they are also protected by the official immunity doctrine. Therefore, we have included them in the discussion pertaining to this area.

23. In light of events which have transpired subsequent to the occurrences of which appellants have complained, concerning the District of Columbia officials, we do not believe that a decision on the injunctive relief sought against these defendant-appellees would be appropriate. On February 17, 1971, the Board of Education of the District of Columbia adopted a revised "Policy Statement Regarding Confidential Information" [see Appendix to this opinion]. which appears to fully protect the rights of students, including appellant-pupils herein. There is no reason to think that this new policy will not be fully implemented by all school personnel, thus we are forced to conclude that there is no substantial threat of future injury to appellants which would necessitate a decision on their request for an injunction against the District of Columbia appellees. Dulles v. Nathan, 96 U.S.App.D.C. 190, 225 F.2d 29 (1955) ; Spreckels Sugar Co. v. Wickard, 75 U.S.App.D.C. 44, 131 F.2d 12 (1941). *See* Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) ; Davis v. Ichord, 143 U.S.App. D.C. 183, 442 F.2d 1207 (1970) ; Reiss v. Richardson, 147 U.S.App.D.C. 219, 455 F.2d 1287 (decided January 13, 1971).

the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

*See* Barsky v. United States, *supra,* 83 U.S.App.D.C. at 136, 167 F.2d at 250; Spalding v. Vilas, 161 U.S. 483, 498–499, 16 S.Ct. 631, 40 L.Ed. 780 (1896); David v. Cohen, 132 U.S.App.D.C. 333, 336, 407 F.2d 1268, 1271 (1969).

Official immunity has not been restricted to those in high government positions. "The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great

that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy." Barr v. Matteo, *supra,* 360 U.S. at 572, 79 S.Ct. at 1340. *See* Cooper v. O'Connor, 66 App.D.C. 100, 107, 99 F.2d 135, 142 (1938); Farr v. Valentine, 38 App.D.C. 413, 420 (1912). Therefore, it is clear that this immunity doctrine is applicable with respect to both the District of Columbia and the Federal officials and employees with whom we are herein concerned.

It has been recognized that, to achieve the desired result, official immunity need not be applied to all actions engaged in by any governmental official. Immunity is only afforded in those instances where the official in question has performed a discretionary [24]—as opposed to a ministerial—act, within the scope of his official duties. Kendall v. Stokes, 44 U.S. (3 How.) 87, 98, 11 L. Ed. 506 (1845); Cooper v. O'Connor, *supra,* 66 App.D.C. at 103, 99 F.2d at 138; Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 164 (1959). *Cf.* Wheeldin v. Wheeler, 373 U.S. 647, 651, 83 S. Ct. 1441, 10 L.Ed.2d 605 (1963). Thus a two-part analysis is required: (1) was the individual performing acts within the scope of his official duties, and (2) did the action undertaken require the exercise of discretion.

It is not necessary—in order that acts may be done within the scope of official authority—that they should be prescribed by statute (United States v. Birdsall, 233 U.S. 223, 230–231, 34 S.Ct. 512, 58 L.Ed. 930, . . .); or even that they should be specifically directed or requested by a superior officer. Mellon v. Brewer, 57 App.D. C. 126, 129, 18 F.2d 168, 171, . . ., certiorari denied, 275 U.S. 530, 48 S.Ct. 28, 72 L.Ed. 409,

---

24. "Where [discretion and judgment] are important, it is desirable that they operate freely and without the inhibiting influence of potential legal liability asserted with

the advantage of hindsight." Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 119, 337 F.2d 152, 155 (1964).

. . . It is sufficient if they are done by an officer *"in relation* to matters committed by law to his control or supervision." [Italics supplied] (Standard Nut Margarine Co. v. Mellon, 63 App.D.C. 339, 341, 72 F.2d 557, 559, certiorari denied, 293 U.S. 605, 55 S.Ct. 124, 79 L.Ed. 696, . . .); or that they have *"more or less connection with* the general matters committed by law to his control or supervision." [Italics supplied] (Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780, . . .; and see Lang v. Wood, 67 App.D.C. 287, 288, 92 F.2d 211, 212); or that they are governed by a lawful requirement of the department under whose authority the officer is acting.

Cooper v. O'Connor, *supra,* 66 App.D.C. at 104, 99 F.2d at 139. *See* Barr v. Matteo, *supra,* 360 U.S. at 575, 79 S.Ct. 1335; Gregoire v. Biddle, *supra,* 177 F. 2d at 581. All of the District of Columbia and Federal officials named as defendants have only engaged in official conduct in furtherance of a duly authorized congressional investigation. "It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action." Watkins v. United States, *supra,* 354 U.S. at 187, 77 S.Ct. at 1179. This obligation is even more compelling where the citizen involved is a governmental official. Pear-

son v. Wright, 156 F.Supp. 136, 137 (D. D.C.1957). *See* Farr v. Valentine, 38 App.D.C. 413, 419 (1912). Clearly the failure of an official to cooperate when matters under his control are being examined by a congressional committee would amount to malfeasance in office. *See* Cooper v. O'Connor, *supra,* 66 App. D.C. at 105, 99 F.2d at 140. We must therefore conclude that all the complained of actions were undertaken by the defendant-officials within the scope of their official authority.

"The test of whether a challenged action is ministerial or non-ministerial is not the office *per se* or its height, but whether the function itself was of such discretionary nature that the threat of litigation would impede the official to whom it was assigned." David v. Cohen, *supra,* 132 U.S.App.D.C. at 337, 407 F.2d at 1272. All of the pertinent actions undertaken by the officials in question here were non-ministerial. The District of Columbia school officials were required to exercise judgment in deciding what information they should provide the House District Committee investigators, who in turn, had to exercise clear discretion in determining what data to seek.[25] For these reasons, we are forced to conclude that the District Court properly dismissed the suit against the District of Columbia school officials,[26] as well as against the Federal officials.[27]

---

25. Appellants have in no way challenged these facts, nor could they.

26. Unlike the situation which was present in Spencer v. General Hospital of District of Columbia, 138 U.S.App.D.C. 48, 425 F.2d 479 (1969) *(en banc)*, we believe that the present case is one where "wise considerations of public policy . . . suggest the undesirability of subjecting the [District of Columbia officials to suit." 138 U.S.App.D.C. at 52, 425 F.2d at 483.

27. Without intimating any opinion concerning the merits of appellants' substantive claims of official abuse of power, we should note that their remedy—if one is in fact called for—lies not with the courts, as we have indicated, but rather with Congress and the general public.

"It is, of course, true," as was said in McCray v. United States, 195 U.S. 27, 55, 24 S.Ct. 769, 776, 49 L.Ed. 78, "that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power."

Barenblatt v. United States, 360 U.S. 109, 132–133, 79 S.Ct. 1081, 1096, 3 L.Ed.2d

For the foregoing reasons, the decision of the District Court must be

Affirmed.

### APPENDIX

### POLICY STATEMENT REGARDING CONFIDENTIAL INQUIRIES

The Board of Education has determined the need to establish certain policies in order to prevent the disclosure of confidential information and reports regarding students and school personnel. It is the view of the Board that there are aspects of the professional relationships of school personnel with students, parents, and community which must be considered privileged and remain confidential.

The Board of Education in an effort to provide for the protection of the confidentiality of certain information related to school affairs and to respond appropriately to inquiries into the conduct of school affairs in the Public Schools of the District of Columbia establishes the following policies with regard to the release of such information:

1. Formal requests for confidential information regarding students and school personnel, shall be addressed to the Board of Education or its designee and the Superintendent or his designee for appropriate action.

2. The names, addresses and other identifying information related to students are not to be released under any circumstances by school personnel without prior written approval by the Superintendent and President of the Board of Education. The Superintendent and the Board of Education shall ensure that the confidentiality of privileged information is protected.

3. The names, addresses and other identifying information related to teachers or any other school personnel are not to be released under any circumstances by school personnel without prior written approval by the Superintendent and President of the Board of Education. The Superintendent and the Board of Education shall ensure that the confidentiality of privileged information is protected.

4. The Superintendent shall define with reasonable precision what is privileged information. The Board of Education may review and amend the Superintendent's definitions.

5. Privileged information can only be released as provided for by Chapter XVI, Section 6, Paragraph 1 of the Rules of the Board.

The foregoing shall not be applicable to legislative or judicial subpoenas issued to school personnel. However, upon receipt of such subpoena the employee, through his supervisor, shall as soon as possible contact either the Superintendent or his designee, who, in turn, may refer the matter to the Corporation Counsel for consideration.

Approved by the Board
February 17, 1971

J. SKELLY WRIGHT, Circuit Judge (dissenting):

The issues presented on this appeal do not raise questions of first impression. Indeed, the law in this area has long been the subject of intense judicial scru-

---

1115 (1959). *See* Tenney v. Brandhove, *supra*, 341 U.S. at 378, 71 S.Ct. 783, 95 L.Ed. 1019; Barsky v. United States, *supra*, 83 U.S.App.D.C. at 136, 167 F.2d at 250.

It appears from oral argument before the District Court that appellants elected to come immediately to court rather than to approach the School Board or the ad-

ministration (Tr. 22). By so doing they may have given more publicity to the information they seek to suppress than would have otherwise resulted. This lawsuit thus may not serve the best interests of appellants. We have not explored the question as to whether appellants were required to request the relief they seek from defendants before bringing this lawsuit.

tiny and, insofar as this case is concerned, the relevant legal doctrines are now well settled. The majority, however, demonstrating a disheartening callousness to the legitimate interests of appellant children, rejects the teachings of experience and strains to revive outworn and repeatedly rejected notions of immunity to justify its result. I cannot and do not concur.

## I

The first question presented for review is whether the District Court has jurisdiction of this action as it relates to the congressional appellees.[1] The majority asserts that publication of the report is absolutely immune to judicial scrutiny under the speech and debate clause of the Constitution.[2] Without reaching the more difficult question whether this clause protects members of Congress under these circumstances, see Powell v. McCormack, 395 U.S. 486, 506, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Stamler v. Willis, 7 Cir., 415 F.2d 1365, 1368 (1969), cert. denied, 399 U.S. 929, 90 S.Ct. 2231, 26 L.Ed.2d 796 (1970), I would hold that the seven congressional appellees who are not members of Congress[3] are not so protected.

The doctrine that the speech and debate clause protects only members of Congress and does not extend to their agents and employees was first enunciated by the Supreme Court in Kilbourn v. Thompson, 103 U.S. (8 Otto) 168, 26 L.Ed. 377 (1880). In Kilbourn the plaintiff was arrested and imprisoned pursuant to a House resolution for refusing to testify at a committee hearing. The case arose in the context of an action for false imprisonment brought by Kilbourn against members of the committee and the sergeant-at-arms who executed the contempt warrant. The Court declared the resolution unconstitutional and, although dismissing the charges as to the congressmen, held that the sergeant-at-arms was not protected by the speech and debate clause and, further, that he was subject to liability for false imprisonment even though he had acted under orders from the House.

Any doubts as to the restricted scope of the speech and debate clause that may have remained after *Kilbourn* were surely erased by the Supreme Court's more recent decisions in Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L. Ed.2d 577 (1967), and Powell v. McCormack, *supra*. In *Dombrowski* the Court held that the speech and debate clause did not cloak the chief counsel to the Senate Internal Security Subcommittee with absolute immunity in an action alleging violations of the plaintiff's Fourth Amendment rights.

Building upon *Kilbourn* and *Dombrowski*, the Court in *Powell* held that an action seeking to compel seating of a member of the House, restoration of seniority privileges, and award of back pay was properly maintainable against the employees of the House. In reaching this result, the Court noted that the purpose of legislative immunity "is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions." 395 U.S. at 505, 89 S.Ct. at 1955. Thus it is not enough simply to

1. Congressional appellees are (1) the chairman and members of the Committee on the District of Columbia of the House of Representatives; (2) the clerk, staff director, counsel and a consultant to the Committee; (3) the Superintendent of Public Documents and the Public Printer; and (4) the United States.

2. Art. I, § 6, cl. 1 of the Constitution reads in pertinent part: "The Senators and Representatives * * * for any Speech or Debate in either House * * *

shall not be questioned in any other Place."

3. These include appellees Clark, Gasque and Garber, who are respectively the clerk, staff director and counsel of the Committee; appellee Martin, the Committee investigator; appellee Little, the consultant to the Committee; and appellees King and Spence, the two named officials of the Government Printing Office.

argue, as does the majority, that the scope of the immunity is in some way dependent upon the validity of the underlying authorization of the employees' conduct. In practical terms, this is a distinction without a difference, for it is now unmistakably clear that "although an action against a Congressman may be barred by the Speech or Debate Clause, legislative employees who participated in the unconstitutional activity are responsible for their acts." 395 U.S. at 504, 89 S.Ct. at 1955. *See* Stamler v. Willis, *supra*, 415 F.2d at 1368; Hentoff v. Ichord, D.D.C., 318 F.Supp. 1175, 1180 (1970). It is therefore apparent, contrary to the majority's conclusion, that the congressional appellees who are not members of Congress cannot assert a defense of privilege under the speech and debate clause as a bar to the instant suit.

Appellees further contend, however, that this suit is foreclosed by the doctrine of separation of powers. Our system of government is distinguished by the care that has been exercised in committing the legislative, executive and judicial functions to separate departments, and it has long been recognized that each department must avoid the temptation to encroach upon the powers and duties of the coordinate branches of government. Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 409, 422, 4 L.Ed. 579 (1819). It is equally well established, however, that "such deference cannot yield to an unnecessary and unreasonable dissipation of precious constitutional freedoms," Watkins v. United States, 354 U.S. 178, 204, 77 S.Ct. 1173, 1188, 1 L.Ed.2d 1273 (1957), and the mere pos-

sibility of conflict cannot justify avoidance of the judiciary's constitutional duty to protect and ensure the rights of citizens. Powell v. McCormack, *supra*, 395 U.S. at 548–549, 89 S.Ct. 1944; Barenblatt v. United States, 360 U.S. 109, 112, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). Indeed, the federal judiciary has consistently held that the separation of powers doctrine does not, of its own force, bar judicial review of congressional investigations. *See, e. g.,* Watkins v. United States, *supra*; United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Kilbourn v. Thompson, *supra*; Stamler v. Willis, *supra*; Hentoff v. Ichord, *supra*, 318 F.Supp. at 1181.[4]

The power of the judiciary to inquire into the affairs of the legislature was expressly set forth in Kilbourn v. Thompson, *supra*, when the Court quoted with approval from Burnham v. Morrissey, 14 Gray 226 (Mass.1859):

" 'The house of representatives is not the final judge of its own power and privileges in cases in which the rights and liberties of the subject are concerned, but the legality of its action may be examined and determined by this court. * * * Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the Constitution and laws, because, living under a written Constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution * * *. * * * *' "

---

4. While these cases primarily concerned the limits of congressional power to acquire information, it is clear that the same principles should also be applied to issues arising out of congressional utilization of information previously obtained, for use of the information, as well as the means of its acquisition, can infringe constitutionally protected freedoms. *See* Hentoff v. Ichord, D.D.C., 318 F.Supp. 1175, 1181 (1970); *cf.* Menard v. Mitchell, 139 U.S.App.D.C. 113, 430 F.2d 486 (1970).

103 U.S. at 199. This power of review is not, of course, absolute. Thus in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court carefully delineated the permissible perimeters of the political question doctrine, a close cousin to the separation of powers concept. The Court declared that the doctrine would bar judicial scrutiny only where at least one of the following factors was present:

> "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. at 217, 82 S.Ct. at 710.

That the present controversy does not fall within the Baker v. Carr formulation is made clear in Powell v. McCormack, *supra*, and Davis v. Ichord, 143 U.S.App.D.C. 183, 442 F.2d 1207 (1970). In *Powell* the Supreme Court applied the principles enunciated in *Baker* in a federal context, holding that the separation of powers doctrine did not bar judicial consideration of a challenge to the attempted exclusion of a congressman by the House of Representatives. After ruling that the right to exclude a duly elected member was not entrusted by the Constitution solely to Congress, 395 U.S. at 518–548, 89 S.Ct. 1944, the Court held that since a judicial determination of the plaintiffs' rights required "no more than an interpretation of the Constitution," the controversy involved neither an initial policy determination of a kind clearly for nonjudicial discretion,

nor a lack of respect due a coordinate branch of government. 395 U.S. at 548–549, 89 S.Ct. at 1978. The Court concluded:

> " * * * Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility. *See* United States v. Brown, 381 U.S. 437, 462 [85 S.Ct. 1707, 1722, 14 L. Ed.2d 484] (1965); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 613–614 [72 S.Ct. 863, 898, 96 L. Ed. 1153] (1952) (Frankfurter, J., concurring); Myers v. United States, 272 U.S. 52, 293 [47 S.Ct. 21, 84, 71 L.Ed. 160] (1926) (Brandeis, J., dissenting)."

395 U.S. at 549, 89 S.Ct. at 1978. (Footnote omitted.)

Similarly, in Davis v. Ichord, *supra*, this court held that invocation of the separation of powers talisman would not foreclose judicial consideration of allegations that the House Internal Security Committee maintained dossiers which were used to inhibit plaintiffs' exercise of constitutional rights. Reiterating the teachings of *Baker* and *Powell*, we declared that judicial review of "an individual's claim of a constitutional right, and, we may add, an individual's claim of infringement of such a right, 'falls within the traditional role accorded courts to interpret the law,' " and does not in any sense violate the separation of powers doctrine. 143 U.S.App.D.C. at 189, 442 F.2d at 1213 (quoting from Powell v. McCormack, *supra*, 395 U.S. at 548, 89 S.Ct. 1944).

As in *Powell* and *Davis*, the claim asserted here involves a congressional infringement of appellants' rights under the Constitution. Thus judicial determination of this claim requires "no more than an interpretation of the Constitution," and since none of the Baker v.

Carr requirements are satisfied,[5] this court is not barred by the separation of powers doctrine. It is argued, however, that in spite of *Powell* and *Davis* we should refrain from deciding the instant case in order to avoid "needless friction" with a coordinate branch of government. In support of this contention, appellees cite this court's decisions in Ansara v. Eastland, 143 U.S.App.D.C. 29, 442 F.2d 751 (1971), and Cole v. McClellan, 142 U.S.App.D.C. 24, 439 F.2d 534 (1970). These cases, however, are inapposite.

In *Cole* this court declined to enjoin the chairman, members and staff of the Senate Permanent Subcommittee on Investigations of the Committee on Government Operations from using information obtained from various colleges and universities through compulsory process. Although appellants in that case claimed that use of such information would violate their rights under the First Amendment, we held that judicial restraint was proper because

> "the salient factors [of the case], taken in conjunction with each other, reveal (a) information delivered to the committee without objection or protest, (b) only the vaguest allegations of anticipated harm * * *, and (c) a lack of any showing of current activity by the committee staffs which constitute, as to the class of plaintiffs, an actual threat along such lines, or which otherwise give immediacy to the claim that constitutional freedoms are being infringed or jeopardized."

142 U.S.App.D.C. at 26, 439 F.2d at 536. (Footnote omitted.) In the case presently before the court, however, appellants had no notice of the investigation or pending report and therefore had no opportunity to object or protest. More-

over, further publication of the confidential and degrading information involved in this case is likely to have a serious detrimental effect. upon the psychological makeup and education of the named children, and there is no reason to believe the Committee staff will not reprint and further distribute the report if given the opportunity to do so.[6]

Similarly, in Ansara v. Eastland, *supra*, the plaintiffs sought relief that would "precede and seek to relate to the conduct of a *future* legislative hearing." 143 U.S.App.D.C. at 31, 442 F.2d at 753. (Emphasis added.) The court denied relief because

> "[t]he ongoing legislative process provides opportunity for presentation of plaintiffs' constitutional contentions. Moreover these contentions, which cannot be decided purely by reference to constitutional text, may be affected by the response within the legislative branch. We * * * note that the plaintiffs will have an opportunity to present their constitutional objections to the Subcommittee. * * * "

*Ibid.* The court then specifically distinguished the present situation, where appellants were not subpoenaed and had no opportunity to claim their constitutional protections at the time of the Committee's hearing.[7] *Ibid.* The legislative process with regard to this report is now complete. Appellants have no other forum in which to assert their constitutional rights; if the judiciary fails to act, these rights will be lost forever.

Finally, appellees and, somewhat surprisingly, the majority urge that Methodist Federation for Social Action v. Eastland, D.D.C., 141 F.Supp. 729 (1956), establishes the separation of powers doctrine as an immutable bar to

---

5. See text at p. 1322 *supra*. *See also* Powell v. McCormack, 395 U.S. 486, 548–549, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

6. Although appellees assert that the members of the Committee have no desire to reprint or further distribute the report (brief of federal appellees at 20 n. 44), they do not suggest that the other con-

gressional appellees will refrain from further publication and distribution.

7. Indeed, the court specifically distinguished Hentoff v. Ichord, *supra* note 4, which was substantially similar to the present case, because "there was no occasion for further legislative determination as to the matter in controversy." 143 U.S.App. D.C. at 31 n. 3, 442 F.2d at 753 n. 3.

judicial consideration of the instant case. In *Methodist Federation* a three-judge court dismissed a complaint seeking to enjoin publication and distribution of a government document where both the Public Printer and the Superintendent of Documents were named as defendants. In reaching this result the court apparently relied, in part, upon both the speech and debate clause and the doctrine of separation of powers, yet it failed even to discuss the implications of *Kilbourn*. Moreover, this decision has never been followed, and in view of the Supreme Court's subsequent decisions in *Baker, Powell* and *Dombrowski* and this court's decisions in *Davis, Ansara* and *Cole*, it obviously is not the law today. *See also* Hentoff v. Ichord, *supra*, 318 F.Supp. at 1180.

## II

Thus, although the power of Congress to conduct investigations and to publish its conclusions is broad, it is not unlimited. As the Supreme Court noted in Watkins v. United States, *supra*:

"* * * We cannot simply assume * * * that every congressional investigation is justified by a public need that overbalances any private rights affected. To do so would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual's right to privacy * * *."

354 U.S. at 198–199, 77 S.Ct. at 1185. Where congressional investigations and reports, no matter how laudable their objectives, encroach upon constitutionally protected liberties, an overriding interest of the state must affirmatively be shown. *See* Barenblatt v. United States, *supra*, 360 U.S. at 126–127, 79 S.Ct. 1081.

A brief examination of the nature and scope of relief sought by appellants may facilitate the search for the precise governmental interests at stake in the present controversy. The material included in the Committee report is not, as the majority contends, merely "somewhat derogatory." One disciplinary letter, for example, alleges that a specifically named child was "involved in the loss of fifty cents" and "invited a male substitute to have sexual relations with her gapping her legs open for enticement."[8] Similar letters accused named children of disrespect, profanity, vandalism, assault and theft.[9] Of the 29 test papers published in the report, 21 bore failing grades.[10] Yet appellants seek only to prohibit use of the children's names without their consent. They do not contest the propriety of the investigation generally, nor do they seek to enjoin the conclusions or text of the report. Indeed, they do not even challenge the right of Congress to examine and summarize the confidential material involved. They wish only to retain their anonymity.[11] The question presented,

8. Investigation and Study of the Public School System of the District of Columbia, H.R.Rep.No.91–1681, 91st Cong., 2d Sess., at 256 (Dec. 8, 1970).

9. *Id.* at 253–258.

10. *Id.* at 224–252.

11. In terms of the injunction sought by appellants prohibiting any further publication or distribution of the report unless appellants' names and addresses are first deleted, I note that under the Freedom of Information Act, 5 U.S.C. § 552 (1970), where the right of the public to know is often in substantial conflict with an express or implied obligation of confidentiality, the solution has been precisely what appellants suggest here—to permit release of relevant documents and papers with deletion of identifying marks which might otherwise cause an invasion of privacy or breach of a confidential relationship with the individuals concerned. *See* Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S.App. D.C. 147, 149–150, 425 F.2d 578, 580–581 (1970); Bristol-Myers Co. v. F. T. C., 138 U.S.App.D.C. 22, 25–26, 424 F.2d 935, 938–939 (1970). Such a resolution is further buttressed by an analogy to those First Amendment cases requiring government, when it has available a variety of effective means to attain a given end, to choose the measure that least interferes with individual liberties. *See, e. g.,* United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967);

then, is simply whether the specific identification of particular schoolchildren in a derogatory context furthers any legitimate governmental interest. Appellees, however, fail even to suggest any such interest. Indeed, the invasion of the children's privacy and use of their names without their consent seems totally unrelated to the concededly proper legislative purpose of investigating the condition of the District of Columbia school system. The majority, however, contends that publication of the names may in some obscure way enhance the credibility of the report. But even if such an interest is valid, the balance here must be struck in favor of appellants.

The right of individuals to live their lives and maintain their personalities and affairs free from undue exposure to the outside world is a central premise of our constitutional and legal framework. *See* Beaney, The Right to Privacy and American Law, 31 Law & Contemp. Prob. 253, 260 (1966). In the time since Warren and Brandeis first enunciated the underpinnings of the right to privacy,[12] the right has matured in status and importance [13] until, in 1965, it was fully recognized as a core protection of the Bill of Rights. *See* Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The scope of the protection is broad, and it safeguards

the general "right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L. Ed.2d 542 (1969). Thus a primary thrust of the right is the freedom of the individual to control dissemination of information concerning his affairs.[14]

This protection is, of course, available to appellant schoolchildren, for the right to privacy, like all constitutional rights, is not "shed * * * at the schoolhouse gate." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *see, e.g.,* Breen v. Kahl, 7 Cir., 419 F.2d 1034, 1036 (1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); Sims v. Colfax Community School District, S.D.Iowa, 307 F.Supp. 485, 487 (1970). Indeed, the inherent nature of the teacher-student relationship demands that any infringements on the student's privacy be carefully scrutinized. The student attends school under the command of the law and, as a result, suffers a considerable diminution of his freedom. *See* Buss, Procedural Due Process for School Discipline: Probing the Constitutional Outline, 119 U.Pa.L.Rev. 545, 548 (1971). The educational system compels the student to reveal his abilities and personality to school authorities. As a

---

Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *see also* Wormuth & Mirkin, The Doctrine of the Reasonable Alternative, 9 Utah L.Rev. 254, 267–293 (1964); Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

12. Warren & Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).

13. The right of privacy is now recognized in virtually every state, *see* W. Prosser, Law of Torts 636–637 (2d ed. 1955), and in the District of Columbia. *See* Pearson v. Dodd, 133 U.S.App.D.C. 279, 410 F.2d 701, cert. denied, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969); Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649 (1966) (en banc); Bernstein v. National Broadcasting Co., D.D.C., 129 F.Supp.

817 (1955), affirmed, 98 U.S.App.D.C. 112, 232 F.2d 369, cert. denied, 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239 (1956).

14. The legal concept of privacy protects the individual not only against intrusions into his private affairs, but also against public disclosure of embarrassing private facts. *See* Mau v. Rio Grande Oil, Inc., N.D.Cal., 28 F.Supp. 845, 846 (1939); Melvin v. Reid, 112 Cal.App. 285, 287, 297 P. 91, 92 (1931); Prosser, Privacy, 48 Cal.L.Rev. 383, 392–398 (1960); Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N.Y.U.L.Rev. 962, 977–984 (1964). In addition, it protects the individual where there has been publicity that has placed him in a false light. *See* Peay v. Curtis Publishing Co., D.D.C., 78 F.Supp. 305 (1948); Prosser, *supra*, 48 Cal.L.Rev. at 398–401.

result, the school system is, in many respects, a depository of personal and often potentially embarrassing information. As a collector of such information, particularly when obtained under the aura of compulsion, the school has a responsibility to the community to act in a careful and discriminating manner, always being cognizant of the harm that can result if the information is dispersed with reckless disregard for the student's interests.[15] Thus, although the initial compelled exposure of the student's private affairs, which in itself constitutes a severe intrusion upon his right to privacy, is clearly justified by the state's overriding interest in educating its citizens, any further encroachments on the student's privacy—through public dissemination of any matter revealed—must be strictly limited and must clearly be necessary to further important governmental interests.

The educational process is not, of course, grounded solely upon the compulsive nature of school attendance. It is dependent also upon its ability to foster a relationship of trust and confidence between teacher and pupil. At the heart of such a relationship is the guarantee that whatever is revealed to the teacher is disclosed in privacy. The student must have a reasonable expectation that his confidence will be preserved. *See* Jourard, Some Psychological Aspects of Privacy, 31 Law & Contemp. Prob. 307, 311–312 (1966); *see also* Fried, Privacy, 77 Yale L.J. 475 (1968). Release of confidential information by school authorities, however, can serve only to destroy the fabric of this trust. And when this breach of trust is compounded, as is contemplated here, by a public disclosure of the failures and inadequacies of specifically named children, the inevitable consequence is the creation of an atmosphere of distrust, anxiety and fear that is itself destructive of the learning process. *See* Shelton v. Tucker, 364 U.S. 479, 487, 47 S.Ct. 163, 12 L.Ed. 387 (1960); Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L. Ed.2d 1311 (1957). As one learned educator has noted:

> " \* \* \* [M]ost children in school are scared most of the time, many of them very scared. Like good soldiers, they control their fears, live with them, and adjust themselves to them. But the trouble is, and here is a vital difference between school and war, that the adjustments children make to their fears are almost wholly bad, destructive of their intelligence and capacity. The scared fighter may be the best fighter, but the scared learner is always a poor learner."

J. Holt, How Children Fail 75 (Dell ed. 1970).

The educational process has been described as "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." Brown v. Board of Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). If our schools are to achieve these goals, it is essential that they

---

15. In numerous instances the legal system offers protection to persons compelled to reveal information to government. The federal government, for example, often prohibits public disclosure of confidential information where individuals are required to reveal such information to government agencies. *See, e. g.,* 2 Fed.Tax Reg. § 301.6103(a) (1964); 18 U.S.C. § 1905 (1970). With regard to the Census Act, which forbids public dissemination of information obtained by census takers, 13 U.S.C. §§ 8, 9, 214 (1970), the courts have upheld the constitutionality of compelled disclosure in part because the information revealed is kept strictly confidential. *See* United States v. Little, D.Del., 321 F.Supp. 388 (1971); United States v. Rickenbacker, S.D.N.Y., 197 F. Supp. 924 (1961).

In the area of school records, many states restrict both the type of records that can be obtained by nonschool personnel and the persons who can obtain them. A major qualification of such statutes is that the school records can be inspected for research purposes only if no pupil will be identified by name. *See, e. g.,* Cal.Educ.Code § 10751 (1969).

present an image of a fair society to these students. We must not compound the numerous negative faces our society already reveals to our youngest citizens. Yet treatment that degrades the student, invades his privacy, and frustrates his ability to gain self-respect must inevitably lead to disillusionment with the society that permits such unfairness and destroys the very foundation upon which he can prepare for a socially productive life.

Publication of this report without excision of the children's names would have consequences far beyond the classroom. These children are not public figures. They have in no way thrust themselves into the public spotlight and have done nothing voluntarily to attract public attention. Yet, once branded, the mark of Cain would follow them for the rest of their lives, seriously impairing their employment opportunities and future careers. A person should be allowed to live without the constant fear that previous indiscretions, particularly childhood indiscretions, will rise from the past to mark him anew. *See* Melvin v. Reid, 112 Cal.App. 285, 297 P. 91 (1931).

In light of these considerations,[16] and in the absence of any overriding governmental interests, I would reverse the District Court's dismissal of this case for lack of jurisdiction and remand for a determination whether an injunction is necessary to prevent any further publication or distribution of this report unless and until the names and addresses of the appellant children are excised.

## III

In addition to appellant's demand for an injunction against the congressional appellees, this case presents many other important and complex claims, all of which were summarily dismissed by the District Court. In ruling on a motion to dismiss, the court must assume all material allegations of the complaint to be true,[17] and the complaint should be dismissed only if it "appears that appellant[s] could 'prove no set of facts in support of [their] claim which would entitle [them] to relief.'"[18] Given these guidelines, I would hold that the District Court's characterization of appellants' claims as "frivolous" was improper and, therefore, that it erred in dismissing these claims without a hearing. Because of this summary dismissal, however, the record as it presently stands is so incomplete as to make it virtually impossible, as far as factual questions are concerned, for this court intelligently to pass on the merits of appellants' claims. Although the majority did not permit this obstacle to stand in its way, I would remand this case to the District Court for a full hearing on the merits.

Appellants claim, for instance, that release of confidential information without deletion of the students' names renders the teacher and principal of Jefferson Junior High School liable in tort for violation of appellants' common law right of privacy.[19] In defense, appellees con-

---

16. Appellants urge further that publication of their names in a stigmatizing manner without notice or hearing violates the requirements of due process. *See* Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In addition, they contend that such publication constitutes an unconstitutional bill of attainder. *See* Wisconsin v. Constantineau, *supra,* 400 U.S. at 444, 91 S.Ct. 507 (Mr. Justice Black, dissenting); Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866). However, I need not reach those questions here.

17. Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 482, 68 S.Ct. 174, 92 L.Ed. 88 (1947); 2A J. Moore, Federal Practice ¶ 12.08 (1968).

18. Jenkins v. McKeithen, 395 U.S. 411, 422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969). *See, e. g.,* Dollar v. Land, 81 U.S.App.D.C. 28, 30, 154 F.2d 307, 309 (1946).

19. Invasion of privacy is soundly established as a common law tort in the District of Columbia. *See* Pearson v. Dodd,

tend that they are protected by the doctrine of official immunity, alleging that release of such information was in furtherance of a "discretionary" rather than a "ministerial" function. *See* Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); David v. Cohen, 132 U.S.App.D.C. 333, 407 F.2d 1268 (1969). Unlike the majority, I would not pass on that question, for it could not soundly be resolved on the sparse record presently before us. As we noted in Carter v. Carlson, 144 U.S.App.D.C. 388, 392, 447 F.2d 358, 362 (1971), cert. granted, 404 U.S. 1014, 92 S.Ct. 683, 30 L.Ed.2d 661 (1972):

> "The distinction between discretionary and ministerial functions in this context must be drawn primarily with reference to its purpose. * * * Accordingly, in determining whether a particular government function falls within the scope of official immunity, it does not suffice to consider simply whether the officer has 'discretion' in the sense that he exercises judgment in choosing among alternative courses of action. The proper approach is to consider the precise function at issue, and to determine whether an officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct."

(Footnotes omitted.) Disdaining the teaching of *Carter,* however, the majority here simply concludes that the conduct of these appellees was discretionary in nature. I cannot join this conclusion, for the complex factual determinations required for intelligent resolution of this issue can be made only after a full evidentiary hearing, and the majority's attempt to decide this question in the present vacuum exemplifies the futility of appellate fact finding.[20]

Moreover, the majority's disposition of this appeal fails even to consider several additional questions raised by appellants. For example, the majority simply ignores the possibility that monetary relief might lie against appellee Little, an independent consultant to the Committee who allegedly prepared the report for publication. It has never actually been decided whether Little was an "employee" of the House within the meaning of the official immunity doctrine; yet if he was not so "employed" the defense of privilege would be unavailable to him in appellants' common law suit for invasion of privacy. In a somewhat similar vein, a question exists as to the status of appellee Martin, a District of Columbia policeman who, while on loan to the United States Capitol Police, allegedly participated in transmittal of school records to the Committee. An inquiry should be made into the nature and propriety of this "loan," for if Martin's investigative activities were beyond the scope of his duties as an employee of the District of Columbia, but were not sufficient to render him an employee of the House, he would be precluded from asserting official immunity as a defense to appellants' common law action for damages.

*supra* note 13; Afro-American Publishing Co. v. Jaffe, *supra* note 13; Bernstein v. National Broadcasting Co., *supra* note 13.

20. Similarly, the majority opinion leaves open the question whether these appellees —the teacher and principal—might be liable to appellants under 42 U.S.C. § 1983, Civil Rights Act of 1871 § 1, R.S. § 1979, 42 U.S.C. § 1983 (1970), for deprivation of their constitutionally protected right of privacy. It should be noted that the courts have consistently held that the District of Columbia is a "State or Territory" within the meaning of this statute. *See, e. g.,* Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); Talbott v. Silver Bow County, 139 U.S. 438, 11 S.Ct. 594, 35 L.Ed. 210 (1891); Sewell v. Pegelow, 4 Cir., 291 F.2d 196 (1961). Liability under the common law and under 42 U.S.C. § 1983 is not necessarily co-extensive, and the scope of the official immunity doctrine seems narrow under the federal statute. *See, e. g.,* Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), cert. granted, 404 U.S. 1014, 92 S.Ct. 683, 30 L.Ed.2d 661 (1972); McLaughlin v. Tilendis, 7 Cir., 398 F.2d 287 (1968); Jobson v. Henne, 2 Cir., 355 F.2d 129 (1966).

Because of the District Court's summary dismissal of this case, we are left virtually in the dark on these and other [21] vital aspects of the instant controversy. An intelligent resolution of appellants' claims demands more information than can presently be gleaned from the record in its abbreviated state. Confronted with such a dilemma, the majority's unfortunate response is simply to usurp the fact finding function or, worse, to ignore the issues entirely. I can neither condone nor join such a decision. This case should be remanded to the District Court for preparation of a proper record so that it may test appellants' factual allegations and pass initially upon the legal issues involved.

I respectfully dissent.

21. For example, a question exists whether the District of Columbia might be vicariously liable to appellants for disclosure of confidential school information by its employees. Such liability might be predicated upon either common law principles or 42 U.S.C. § 1983. *See* note 20 *supra*.

And although this issue is not resolved simply by finding that the employees themselves may assert a defense under the official immunity doctrine, *see* Carter v. Carlson, *supra* note 20, the majority fails even to consider this claim.