The **WASHINGTON FREE COMMUN-ITY, INC., et al., Paul Becker,** Appellant,

v.

**Jerry V. WILSON, Chief of Police, Metropolitan Police, et al.**

No. 71-2008.

United States Court of Appeals, District of Columbia Circuit.

Argued June 7, 1972.

Decided May 16, 1973.

Rehearing Denied Nov. 5, 1973.

Curtis E. Van Kann, Washington, D. C., with whom Ralph J. Temple, Washington, D. C., was on the brief, for appellant.

David P. Sutton, Asst. Corp. Counsel for the District of Columbia, with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellee.

Before BAZELON, Chief Judge, and McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

The suit giving rise to this appeal was filed in the District Court nearly four years ago, seeking relief from allegedly unlawful conduct by law enforcement agencies in the District of Columbia. Partial relief was forthcoming after a trial on the merits.[1] This appeal challenges the denial of other relief, primarily injunctive, sought by the litigants. For the reasons set forth below, we affirm the order of the District Court.

**I**

On July 11, 1969, Washington Free Community, Inc., corporate publisher of a self-styled bi-weekly "underground" newspaper known as the *Washington Free Press,* and its President Hastings and Vice President Weber, both of whom also served as street vendors of the paper, brought suit against then Chief Layton and Acting Chief Wilson of the District of Columbia Metropolitan Police, and Chief Wright of the United States Park Police, for deprivation of their civil rights. The complaint alleged that the police authorities had, since February, 1969, been engaged in a continuing and tolerated pattern of harassment and intimidation of the *Free Press* and its vendors. Charging that such actions constituted a denial of both their First Amendment rights to freedom of speech and the press, and their Fifth Amendment right to equal protection of the law,[2] those plaintiffs sought (1) a declaration under 28 U.S.C. § 2201 (1970) that the acts complained of were violative of those constitutional rights, (2) injunctive relief under 42 U.S.C. § 1983 (1970) to prohibit defendants' interference with the publication, circulation, and distribution of the *Free Press* and to require defendants to issue writ-

ten directives to the same effect and subsequently to submit evidence of compliance therewith, and (3) compensatory and punitive damages.

Accompanying the complaint was an application for a temporary restraining order and a motion for a preliminary injunction, with affidavits in support thereof. The District Court denied the application on July 25, 1969, and the motion on August 1, 1969 (the day Chief Wilson officially replaced Chief Layton). In December, 1969, we affirmed the denial of preliminary relief. *See* note 1 *supra.*

In September, 1970, plaintiffs' motion of July, 1970 to amend their complaint was granted. The amendment added as parties plaintiff, the Quicksilver Times, Inc., corporate publisher of the underground newspaper *Quicksilver Times,* its President, one Becker, who was also an editor, reporter, and vendor of the *Times,* and staff member Jaillet of yet another such newspaper, the *Washington Area Free Press;* and as parties defendant one Drescher, a former Metropolitan Police Officer, and the District of Columbia. The relief requested was altered in that (1) the corporate plaintiffs sought certification to represent the class of corporate publishers similarly situated, and the individual plaintiffs sought to represent editors, reporters and vendors similarly situated; (2) the prayer for declaratory relief was revised to include a declaration of the unconstitutionality of a Department of Interior regulation, 36 C.F.R. § 50.24, enforcement of which would have allegedly resulted in the continuation of the Park Police actions complained of; and (3) the prayer for money damages in the original complaint was replaced by a similar prayer, under 42 U.S.C. § 1983

---

1. This matter was before us earlier on an appeal from the denial by the District Court of a preliminary injunction. Washington Free Community, Inc. v. Wilson, 426 F.2d 1213 (1969). We declined, Chief Judge Bazelon dissenting in part, to disturb the District Court's exercise of discretion in this respect.

2. It is clear that, as applied to the District of Columbia, the Due Process Clause of the Fifth Amendment embodies the guarantee against unjustified discrimination underlying the Equal Protection Clause of the Fourteenth Amendment. *See, e. g.,* Shapiro v. Thompson, 394 U.S. 618, 642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

(1970), by Quicksilver and Becker against Drescher and the District for an allegedly wrongful arrest of Becker by Drescher which was said to have violated important rights of these plaintiffs and to have flowed from negligent training and supervision of Drescher by the District.

A two-day trial was held in June, 1971, with respect to that part of the amended complaint directed against the Metropolitan Police (hereinafter Police), Drescher, and the District.[3] The trial court denied all relief sought against the Police. *Washington Free Community, Inc. v. Wilson,* 334 F.Supp. 77, 79–81 (D.D.C.1971). Plaintiffs moved for a new trial to present new evidence to support their claim against the Police, or alternatively for a vacation of that part of the judgment concerning the Police in light of the new evidence. The

motion was denied in October, 1971, and this appeal was brought from the denial of that motion and the order denying the equitable relief sought against the Police.[4]

The relief requested from this court by the appellant (*see* note 4 *supra*) is a reversal of the judgment of the District Court with directions that a restraining injunction shall issue against appellee and members of his force to prevent the asserted denial of appellant's constitutional rights. This request reflects appellant's acknowledgment that it is injunctive, not declaratory, relief that is the primary objective of the litigation. Appellant seeks this remedy in reliance upon 42 U.S.C. § 1983, which provides in part that those who, under color of the law of any State or Territory, deprive a party of his constitutional rights, shall be liable to that party in a suit in equity.

3. Following this trial the District Court held a separate hearing on cross motions for summary judgment regarding that part of the amended complaint directed against the Park Police. The court subsequently granted plaintiffs' motion and held the aforementioned regulation to be overly broad and in violation of the First Amendment as it was applied to the sale of newspapers in national capital park areas. *Washington Free Community, Inc. v. Wilson,* 334 F.Supp. 77, 81–83 (D.D.C. 1971). Since a cross-appeal from that ruling by defendant Wright was later withdrawn, and since the District Court's ruling provided the principal relief sought against the Park Police, no allegations against the latter are before this court now.

4. The result we reach embraces only such relief since the prayer for damages against defendants Drescher and the District was dropped at trial for want of service of process against the latter parties. It also eliminates our need to pass on questions raised by this appeal concerning the proper scope of that relief, which would be affected by both the parties seeking relief, and their ability to represent persons similarly situated. Concerning the former, only Becker remains a party to this appeal. Following trial, plaintiffs filed a motion in the District Court for leave to proceed on appeal *in forma pauperis,* which the trial judge granted

only as to Becker. A similar motion was filed in this court with respect to the other plaintiffs. That motion was first denied as to the remaining individual plaintiffs Hastings, Weber, and Jaillet (it appearing by affidavit that they had departed the area, current addresses unknown, and thus could not provide the affidavits required by 28 U.S.C. § 1915 (a) (1970)); and later denied as to both corporate plaintiffs Washington Free Community, Inc. (it appearing by affidavit that it was no longer an active corporation, its former associates also not being available to file the required affidavits), and Quicksilver Times, Inc. (it having failed to fulfill the affidavit requirements set forth in S.O.U.P., Inc. v. FTC, 146 U.S.App.D.C. 66, 449 F.2d 1142 (1971)). These five parties not having filed, subsequent to the denial of the above motion, a further motion for leave to docket their appeals time having expired, nor tendered the appropriate fee, *see, e. g.,* Williams v. United States, 115 U.S.App.D.C. 134, 317 F.2d 569, 572 n. 2 (1963) (Miller, J., dissenting), only Becker remains as an appellant—although he was unable to attend the trial due to his presence in Florida pursuant to a doctor's orders. Our affirmance makes it unnecessary to consider whether Becker (hereinafter appellant) may obtain class relief, and treats the issues no differently than if all plaintiffs below were prosecuting this appeal.

■ The Supreme Court has recently ruled that the District of Columbia is not a "State or Territory" within the meaning of Section 1983. District of Columbia v. Carter, 409 U.S. 418, 93 S. Ct. 602, 34 L.Ed.2d 613 (1973). Appellant therefore does not state a cause of action over which the District Court, by virtue of 28 U.S.C. § 1343(3) (1970), may exercise jurisdiction. Our analysis proceeds, however, on the assumption that appellant by complaint amendment could properly invoke that court's jurisdiction and state a claim upon which injunctive relief could be granted.[5]

## II

■ We begin our inquiry by reference to our recent reaffirmation of the principle that

[i]n order for a court to grant an injunction [against police action] there should be a showing that there is a substantial risk that future violations will occur. In order to show a substantial likelihood of future conduct, a clear pattern of harassment must be shown.

Long v. District of Columbia, 152 U.S. App. D.C. 187, 469 F.2d 927, 932 (1972). And we are further guided by the more general consideration expressed by Mr. Justice Frankfurter who, in writing for a unanimous Court, stated:

The history of equity jurisdiction is the history of regard for public consequences in employing the extra-ordinary remedy of the injunction. . . . Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies.
. . .

Railroad Commn. of Texas v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

While the latter proposition was stated in the context of a federal court's abstention from constitutional adjudication when an alternate resolution in a state forum was available, ·it appears clear that similar compelling considerations operate in contemplating federal injunctive intervention into the operations of a local police force,[6] where a balance must be struck between the role of federal courts in preserving constitutional

---

5. Jurisdiction might be based upon general federal question jurisdiction, 28 U.S.C. § 1331(a) (1970), or, given the time of filing of the original complaint, upon D.C.Code § 11–501(1) (Supp. V, 1972), which continues the jurisdiction of the District Court under D.C.Code § 11–521 (a)(1) (1967) until the effective date of the District of Columbia Court Reorganization Act of 1970. See Gomez v. Wilson, 155 U.S.App.D.C. 242 at 250–254, 477 F.2d 411 at 419–423 (1973).

Carter, supra, itself suggests the litigability of a claim of alleged deprivation of constitutional rights by reference to authorities permitting such suits directly under constitutional provisions, see, e. g., Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); and those authorities appear to have been expanded beyond their original dimensions of Fourth and Fifth Amendment violations, see, e. g., Howard v. Warden, 348 F.Supp. 1204 (E.D.Va. 1972) (First and/or Ninth Amendments), and of relief in terms of monetary damages, see, e. g., Brown v. Donielson, 334

F.Supp. 294 (S.D.Iowa 1971) (injunctive relief).

6. Appellant would have us distinguish between the prohibitory nature of the injunction sought here, as contrasted with injunctions mandatory in nature, which would assertedly amount to a greater intrusion of judicial power into internal police operations calling for a correspondingly stronger showing of necessity for such intervention. But the proposed form of injunction at Appendix D of appellant's brief does envision requiring appellee to formulate a written order to all members of the Department embodying the prohibitions of the proposed injunction itself; and indeed we think the type of allegedly tolerated conduct sought to be prohibited could be dealt with effectively only by affirmative action on appellee's part, see, c. g., Note, The Federal Injunction as a Remedy for Unconstitutional Police Conduct, 78 Yale L.J. 143, 147 (1968), which an injunction cast even in the broad prohibitory language of appellant's proposal would precipitate. See, e. g., Belknap v. Leary, 427 F.2d 496, 498 (2d Cir. 1970) (Friendly, J.).

rights and the independent initiative of local officials to accomplish the same end in a manner of their choosing. *See, e. g.,* Lankford v. Gelston, 364 F.2d 197, 201 (4th Cir. en banc, 1966). "[S]uch relief must not be granted lightly, for unduly obtrusive or hasty judicial intervention can undermine the important values of police self-restraint and self-respect." *Long, supra,* 469 F.2d at 934 (Wright, J., concurring). We think the facts of the present case provide good reason for the self-denying discretion exercised by the District Court.

In order to establish a pattern of illegal police conduct and toleration of such conduct by the police hierarchy sufficient to warrant a finding of likely future violations requiring equitable relief, appellant's original complaint was accompanied by the affidavits of approximately twenty individuals setting forth episodes of police encounters with *Free Press* vendors ranging from a Virginia arrest for solicitation without a license to a Maryland conviction for possession of, and intent to distribute, obscene matter. Eleven such affidavits set forth approximately fifteen encounters with the Metropolitan Police, including at least five wherein the dispute centered around the belief of the officers involved that the vendors were unlawfully engaged in vending without a license. D.C.Code § 47–2336 (1967).[7] Three of those affidavits related instances of Police direction to vendors to "move on."

In its aforementioned denial of the preliminary injunction, the District Court considered, along with these affidavits, a May 15, 1969 letter from counsel for *Free Press* vendors to then Chief Layton requesting that alleged vendor harassment and spurious arrests cease, and that a directive be issued to insure that caution be taken in decisions to arrest vendors. Chief Layton's July 11, 1969 reply stated that an investigation revealed no evidence of police misconduct, and that the requested directive would be superfluous in view of standing instructions concerning proper arrest procedures.

At trial, appellant introduced the eleven affidavits mentioned above, as well as the testimony of eight other witnesses —at least four of whom described situations entailing uncertainty over the applicability of the vending license requirement, and six of whom complained of having been directed to "move on," some in connection with the license requirement and some not—to substantiate the claim of vendor harassment.[8] Taken

---

7. The statute provides in relevant part:
No person shall sell . . . anything whatever, excepting newspapers sold at large and *not from a fixed location,* upon . . . public space in the District of Columbia, without a license first having been obtained . . . . (Emphasis added).

8. One of those witnesses—the vice president of the *Quicksilver Times*—and one reporter each from the *Washington Post* and the *Washington Evening Star,* testified concerning reporter harassment. The *Times* official described two incidents in which his attempts to cover an event were prevented by allegedly wrongful Police action; the reporters described the arrest of appellant by Drescher sued upon in the amended complaint; and one of appellee's witnesses testified to a second such arrest of appellant by a different police officer. The District Court, focusing upon Drescher's arrest of appellant, assumed it to be an improper interference with valid news-

gathering but, characterizing it as an isolated incident, held it to be an inappropriate basis for declaratory and injunctive relief. 334 F.Supp. at 81. In partial support of the motion for a new trial, appellant filed his affidavit setting forth his second arrest referred to above, an incident of news-gathering interference by a U.S. Park Police officer, and "four or five other" unspecified occasions of access denial by the Police. These eight or nine versions of encounters, some already controverted by appellee at trial, with a police force of approximately five thousand members, over the two and one-half year span embraced by the allegations of the complaint, do not in our view constitute the substantial likelihood of future violative conduct against reporters justifying equitable intervention by the federal courts, *Long, supra;* nor do we think the circumstances reveal the kind of substantial controversy of sufficient immediacy and reality to warrant issuance of a declaratory judgment. Golden v. Zwick-

together, this evidence revealed some thirty-seven specific episodes of alleged harassment by the Police, five of which were contradicted by appellee's evidence. In addition, the eight witnesses estimated the number—ranging from four to one hundred and averaging approximately forty-five per witness—of similar episodes, not otherwise described, which each said he had experienced or witnessed; and appellant further proffered the testimony of nine more witnesses— the affidavit of one already having been in evidence—which would have been essentially cumulative.

Both the affidavits and testimony produced by appellant reveal the bulk of Police-vendor confrontations to have been bottomed on the vending license requirement for the sale of newspapers "from a fixed location," *see* note 7 *supra,* and/or Police instructions to vendors to "move on." While appellant would characterize the latter as "not necessarily related to the vending license issue," we think there is a sufficient nexus between "fixed location" and "move on" to implicate the statutory requirement in this dispute.

OD v. Wilson, 323 F.Supp. 76 (D.D.C. 1971), decided February 5, 1971, enjoined police interference with the sale of a *Free Press* supplement, *Tasty Comix,* for the failure of its vendors to have a vending license—even though the *Free Press* itself had ceased publication. The court held that the administrative control over the exercise of *Tasty Comix'* First Amendment rights by enforcement of the licensing requirement without appropriate governing standards was constitutionally defective. With

reference to the order issued by the three-judge court in *OD*, plaintiff's counsel in that case wrote the Corporation Counsel of the District on April 1, 1971, complaining that the Police were interpreting the phrase "fixed location" contained in that order to include newspapers stacked on the sidewalk, permitting the arrest of *Quicksilver Times* vendors. Mention was made that appellant's counsel had received assurances that the interpretation would be raised with the addressee; and concern was also expressed on behalf of *OD* plaintiffs.

Two months later, in order to "obviate the need for litigation," the Corporation Counsel sent a memorandum to appellee stating his opinion that, properly interpreted, the statutory term "fixed location" did not include newspapers stacked without benefit of any physical facilities. 334 F.Supp. at 83–84. On June 7, 1971, two days before trial began, appellee adopted this interpretation in a directive sent to all members of the Metropolitan Police,[9] stating that vendors may sell newspapers from such stacks without a license, even if sales were made daily from the same location. 334 F.Supp. at 84.

Stating that the licensing statute was the "section of the code police officers had been relying upon when they informed plaintiff vendors that they needed a license to sell papers or had to 'move on,'" 334 F.Supp. at 79, the District Court, noting that no complaint or request for disciplinary action had been filed with the Department nor had any civil suit been instituted, held: "Any threat to First Amendment rights that

ler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed. 2d 113 (1969). This applies with even greater force to the class relief requested for editors of underground newspapers, of which appellant was one, about whom no evidence of harassment was adduced.

9. Appelle in post-hearing memoranda stated that (1) the directive would be treated as a "circular" under the new December, 1971, system for governing the publication

and maintenance of directives, (2) it would be given special distribution to each member of the Department, required to be maintained for a year, and incorporated in the Department's training program, and (3) any knowing violation of such circulars, or officer neglect in familiarizing himself with such statutory interpretations, can be grounds for disciplinary action.

existed previously has been cured by the new interpretation of the statute." *Id.*, at 80. This was so because

> the new opinion and directive effectively reverses department policy *vis-a-vis* underground newspaper vendors. . . . [Since] the police officers were acting under color of authority as they understood that authority . . . [u]nder the new interpretation . . . there should be no repetition of the police activities on which the complaint was founded. *Id.*

In support of the motion for a new trial apart from appellant's own affidavit, *see* note 8 *supra*, appellant filed a second affidavit in which the affiant, a *Quicksilver Times* vendor, recounted three incidents within the two and one-half months subsequent to the promulgation of the directive wherein the Police challenged his right to sell the *Times* from a fixed stack without a license. Concerning the only incident for which the affiant had specified a badge number, the officer so identified attested that he had become familiar with the directive and that the affiant's newspapers were so dispersed on the sidewalk they had become a pedestrian obstacle, necessitating his order to the affiant to remove them. The District Court denied the motion after considering the affidavits and hearing oral argument.

### III

This court has previously held that a policy revision instituted after and designed to eliminate offending governmental conduct can obviate the necessity for enjoining such conduct, there being no reason to believe the revision would not be fully implemented. Doe v. McMillan, 148 U.S.App.D.C. 280, 459 F.2d 1304, 1316 n. 23, cert. granted, 408 U.S. 922, 92 S.Ct. 2505, 33 L.Ed.2d 332 (1972). Similarly here, appellee's interpretative directive, striking as it does at what we and the District Court conceive to be the reason for the greater portion of the challenged Police conduct, *compare, e. g., Lankford, supra,* 364 F.2d at 201, represents the kind of responsive and potentially effective local initiative whose influence in preserving constitutional rights deserves an opportunity to work before the power of the federal judiciary is invoked to achieve the same end.

The evidence brought forth by appellant concerning post-directive Police conduct does not appear to be of such magnitude as to refute the likelihood of general Police compliance therewith; and, to the extent that it does suggest future non-compliance, it would appear too early, especially in light of appellee's representations in note 9 *supra*, to support a conclusion that Police conduct revealed by appellant's pre-directive evidence— even assuming that evidence established the requisite pattern of harassment— would continue.[10] Our remand in *Gomez*, note 5 *supra*, on comparable evidence of continuing misconduct, differs critically in that police procedures there concededly permitted apparently unlawful conduct. A few incidents consistent with such a policy establish a significantly different likelihood from a few incidents running counter to Department guidelines, as in the instant case.

In addition to the directive's likely effect on official behavior, it also serves to weaken whatever claim appellant had that the allegedly unlawful behavior met with that official departmental toleration which would increase the likelihood of future misconduct. Although it is true that appellee must be charged with knowledge of the previously mentioned correspondence between appellant's counsel and Chief Layton, that matter was concluded adversely to appellant by ap-

---

10. In this connection we note that appellant's claim that Police conduct denied them equal protection of the law, conceded by appellant's counsel at oral argument to be of lesser importance, fares no better than their claim under the First Amendment, in light of the curative directive's removal of the primary authority in the name of which discriminatory enforcement might take place.

pellee's predecessor in office.[11] Only one similar approach, aside from the continuation of the present litigation, was made to appellee. That effort was not undertaken until nearly two years later, and two months before trial, through the office of the Corporation Counsel, and only in part on behalf of appellant by counsel in another case. Appellant would have us make much of the timing of appellee's response, issued as it was only two days before trial, but where, as here appellant had ample opportunity to seek an earlier response, and where appellee did respond within five days after receiving the Corporation Counsel's memorandum to him, we do not have a proper basis for suspecting its genuineness.

Appellee's response also suggests receptivity to administrative procedures to remedy appellant's complaints short of judicial intervention—procedures the District Court noted had not been sought in this case. While we do not believe such steps to be an invariable condition precedent to the institution of litigation, under circumstances where a new regime's responsiveness has not been tested by litigants and where such inquiry appears to hold forth a possibility of alternative relief,[12] failure to take those steps is a factor not to be ignored in the avoidance of "needless friction" with local policies. Those policies can arguably prove to be more effective in the preservation of civil rights generally than can isolated and sporadic litigation. *See* Amsterdam, note 12 *supra*, at 787–91. Finally, our disposition of this appeal takes cognizance of the present status of the litigants.[13]

In view of the foregoing, we think an adequate remedy was provided by the declaration of the District Court:

> To avoid future problems the Court will re-emphasize that the plaintiffs have the right to sell and distribute

11. The correspondence was served on appellee as part of appellant's amended complaint. The two incidents referred to therein, the media coverage of Drescher's arrest of appellant, appellant's unadjudicated complaint, and the "no-papering" of several charges of vending without a license, do not in any event appear to amount to a showing that appellee was (1) aware (2) of improper Police conduct (3) sufficiently widespread to require formal corrective action, such that his failure to take action prior to the promulgation of the directive constituted official toleration of an unconstitutional pattern of harassment.

12. Apart from appellee's directive, we note his unilateral adoption of procedures designed to correct Departmental deficiencies. *See, e. g.*, Wilson, J. and G. Alprin, Controlling Police Conduct: Alternatives to the Exclusionary Rule, 36 Law & Cont. Prob. 488, 498 (1971):
   > In cooperation with the local United States Attorney's Office . . . [t]he Case Review Section maintains records by officer and unit so that recurrent patterns of misconduct or procedural error can be observed and corrected.

   The directive formulation in the instant case also serves to enhance the visibility of Departmental policy making, making the abuses alleged herein even more subject to nonjudicial resolution, as for ex-

ample through complaints of directive violations, *see* note 9 *supra*, through appellee or his District superiors to the Complaint Review Board or Trial Board —procedures which in themselves would appear to be of salutary effect on law enforcement. *See generally* McGowan, Rule-Making and the Police, 70 Mich.L. Rev. 659 (1972); Amsterdam, The Supreme Court and the Rights of Suspects in Criminal Cases, 45 N.Y.U.L.Rev. 785 (1970). We again note a distinction from our remand in *Gomez*. The opportunity short of litigation to bring complaints of misconduct here would likely meet with comparatively greater receptivity, asserting as those complaints would violations of the Department's own policies rather than conduct consistent with its policies.

13. *See* note 4 *supra*. The cessation of *Free Press* publication was conceded by appellant and is further substantiated by the Chairman of the Rutgers University department of political science, who also made this observation about the *Times:*
   > But it is almost entirely gone now, those hundreds of little papers we called the underground press. . . . Departed are . . . the Quicksilver Times and the Washington Free Press in the District of Columbia . . . .
   
   Wash.Post, Apr. 8, 1973, § C, at 5, col. 1.

their papers without obtaining a license, that the plaintiffs can stack the papers on the sidewalks, and that the plaintiffs are not required to keep moving.

334 F.Supp. at 80. Appellant is free to invoke the Department's administrative procedures or to file another suit should the Police conduct complained of originally be continuing, but under the circumstances here presented this litigation has run its course.

Affirmed.