SIXTEENTH OF SEPTEMBER PLANNING COMMITTEE, INC., a Colorado Nonprofit Corporation, Chairperson, Arturo Rodriquez, Vice-Chairperson, Theresa Romero, Secretary, Mary Espinoza, Treasurer, Maria Subia, Plaintiffs,

v.

The CITY AND COUNTY OF DENVER, COLORADO, William H. McNichols, Individually and as Mayor of the City and County of Denver, Colorado, Dan Cronin, Individually and as Manager of Safety of the City and County of Denver, Colorado, Art Dill, Individually and as Chief of Police of the City and County of Denver, Colorado, John Doe 1 and other John Does, whose true names are unknown but whose identities are known to named defendants, Individually and as officers of the Denver Police Department, Denver, Colorado, Edward F. Burke, Jr., Elvin R. Caldwell, Salvadore Carpio, Cathy Donahue, Stephen Grogan, Paul A. Hentzell, Kenneth M. MacIntosh, James J. Nolan, Larry Perry, William S. Roberts, J. L. Sam Sandos, L. Don Wyman, Cathy Reynolds, Individually and as members of the City Council for the City of Denver, Colorado, Defendants.

Civ. A. No. 78–K–798.

United States District Court,
D. Colorado.

Aug. 15, 1979.

Normando R. Pacheco, Denver, Colo., for plaintiffs.

Gerald Himelgrin, Asst. City Atty., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

In this action plaintiffs seek equitable and monetary relief because of the application of a municipal ordinance which allegedly deprives them of First Amendment rights. Plaintiffs are members and officers of the Sixteenth of September Planning Committee, Inc., a Colorado nonprofit corporation which is dedicated to advocacy of Chicano concerns. Several of the committee's specific goals, as set out in the complaint, are "to work toward a greater understanding between Chicanos and other racial and ethnic groups," "to foster self-respect, identity and dignity among Chicanos," and "to petition the government for redress of grievances through peaceful assembly and demonstration." (Complaint, at ¶ 5.) Defendants are the City and County of Denver and various city officials and employees, including the mayor and city council.

The action arises under 42 U.S.C. § 1983 and its jurisdictional counterpart at 28 U.S.C. § 1343. Jurisdiction is also alleged on the basis of 28 U.S.C. § 1331. In addition to compensatory damages, plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201, to the effect that the challenged Denver ordinance be declared unconstitutional and void, and a permanent injunction to enjoin defendants from its enforcement.[1]

---

1. Plaintiffs have also alleged injury pursuant to 42 U.S.C. §§ 1981 and 1985, because of alleged violation of their right to equal protection of the law and an alleged conspiracy by defend-

Section 332.5 of the Revised Code of the City and County of Denver relates to parades and processions and provides that "[n]o parade or procession shall be allowed upon any street or public way until a permit therefor shall first be obtained from the Manager of Safety in accordance with the provisions of this Section; . . . ." Revised Municipal Code of the City and County of Denver, § 332.5–1. Under the permit scheme set forth in the municipal code, applications to conduct a parade or procession must be made in writing to the Chief of Police and must set forth the procession's proposed route, the time of starting, the name of the responsible person or organization, and the purpose or object of the procession. In addition, the code provides:

§ 332.5–1(3). Upon such application being made, the Chief of Police shall investigate or cause to be investigated the person or society making such application and the truth of the statement made in such application regarding the purpose or object of such parade or procession;

§ 332.5–1(4). If the Chief of Police shall find that such parade or procession is not to be held for any unlawful purpose and will not in any manner tend to a breach of the peace, or unnecessarily interfere with the public use of the streets and ways or the peace and quiet of the inhabitants, he shall recommend issuance of such permit by the Manager of Safety to the applicant upon payment of the permit fee in advance.

The evidence shows that, in practice, a sergeant of the Denver Police Department initially decides whether a permit should be granted and, in the course of doing so, makes legal interpretations concerning the scope and application of the permit requirements.

In addition to the general provisions in § 332.5, subsection .5–2 establishes requirements which relate specifically to parades or processions in the "Central Business District," which area is defined as follows:

[F]or the purposes of this Section, the [Central Business District] shall be bounded by and shall include the following streets: Commencing at the intersection of Larimer Street and 20th Street; thence proceeding Southwesterly on Larimer Street to Speer Boulevard; thence Southerly on Speer Boulevard to 13th Street to Colfax Avenue; thence Easterly on Colfax Avenue to Lincoln Street; thence Northerly on Lincoln Street to 20th Street; thence Northwesterly on 20th Street to the intersection of 20th Street and Larimer Street.

Municipal Code, § 332.5–2. Application for a permit in this area must be made at least thirty days in advance of the proposed event. More importantly, the subsection provides that:

.5–2(1). No such permit shall be issued for such a parade or procession to be held between 7:00 a. m. and 6:00 p. m. on any day other than Saturdays, Sundays, or holidays as defined in Subdivision 501.4–3 of this Code. The Manager of Safety may issue permits for parades beginning after 6:00 p. m. but lasting no later than 10:00 p. m. on any day at his discretion subject to the other provisions of this Section.

.5–2(4). Effective January 1, 1978, no such permit shall be issued for a parade or procession held on any street or public way within the Central Business District between the hours of 7:00 a. m. and 6:00 p. m. other than 14th Street and 15th Street between Broadway and Curtis Street. (Ord. 117, Series 1977)

Municipal Code, § 332.5–2(1) and (4).

On July 6, 1978, plaintiffs applied for a permit to conduct a parade in downtown Denver on Friday, September 15, 1978 between the hours of 9:00 a. m. and 4:00 p. m., along a requested route on 14th, 15th and 16th Streets.

As the name of the plaintiff planning committee suggests, the 16th of September is a date which has particular meaning and significance. As stated in one of its publications:

ants to deprive them of their First Amendment rights and of equal protection. For reasons

stated below, the court finds that these claims are without merit.

Throughout Mexico, September 16th exemplifies independence and the cry for self-determination that was heard around the world in 1810 when a humble priest named Miguel Hidalgo y Costilla dared to envision a free Mexico. Dispatching his men to resound his "Grito De Dolores" throughout Mexico, Hidalgo was not aware then that his same cry for independence would travel the barren wastes of time and implant itself in the heirs to a spirit of self-determination and independence that was Hidalgo, Morelos, Zapata and Villa.

The question naturally arises if September 16 is the important date, why was the application made for a parade to be held on September 15th? The answer to this question explains the case. September 16, 1978 fell on a Saturday. Plaintiffs' application for the permit was not motivated by a desire to enjoy fellowship but rather by a sense of mission:

The question that is posed by many people is the reasoning behind the choice of September 16th by Chicanos to voice our discontent of the lifestyles, value systems and burden of cultural genocide placed upon our shoulders by this society. The relation is clearly one of heritage and cultural roots. It is also based upon family ties, blood lines, ancestral traditions and cultural heritage. *But more importantly it is appropriate that a Chicano people display their determination for social justice and Chicano/Mexicano Liberation.* (Emphasis added.)

This case involves political expression of the most traditional and respected sort. While plaintiffs' activity is also a celebration of Mexican freedom, it is primarily a demonstration of political and social grievances.

In this case, the effect of § 332.5–2 is to proscribe all weekday processions in the central business area of Denver, between the hours of 7:00 a. m. and 6:00 p. m., except on 14th and 15th Streets between Broadway and Curtis. To one not familiar with the Denver area, this regulation might appear as one which reasonably confines public processions to certain times and

places, but, for better or worse, Denver's is one of those downtown areas where the workday population greatly exceeds the population which remains after 6:00 p. m. and on weekends. It is estimated that approximately 82,300 people work in the downtown Denver area while only about 2,300 people live there. Indeed, one could roll a bowling ball down 17th Street after 6:00 p. m. and not hit anyone.

On the basis of § 332.5–2 *et seq.,* defendant Dan Cronin, Denver's Manager of Safety, denied the permit application. Plaintiffs filed this action on August 7, 1978 and sought preliminary injunctive relief on the grounds that they had been deprived of First Amendment rights and equal protection of the law. On August 16, 1978, plaintiffs' motion for a temporary restraining order was granted and defendants were ordered to issue the permit as requested. With that permit, plaintiffs conducted the planned activity on September 15. A trial was held on February 2, 1979, briefs were filed and the matter is ready for final disposition.

The basic positions of the parties are relatively easy to state. Plaintiffs argue that § 332.5–2 is a continuing prior restraint on their First Amendment rights and effectively deprives them of those rights, since the questioned section of the code works a total prohibition of efforts to reach their intended audience. Defendants' response is that § 332.5–2 is nothing more than an allowable regulation concerning the time, place and manner of parades and processions which are proposed to take place in Denver's central area, and that these constraints are justified by legitimate concerns for traffic regulation and public order.

II

It is helpful, at the outset, briefly to indicate what this case does not involve. There is neither claim nor evidence showing, for instance, that plaintiffs' activity presents any clear and present danger of violence or disorder. Nor does the activity threaten to invade private homes or other areas which have been found incompatible

with certain modes of expression. *See, e. g., Adderly v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). Instead, the evidence shows that, at all times, plaintiffs' activity has been limited to a peaceful and orderly procession on a few of Denver's commercial streets.

■ On the other hand, this is not a case where officials have arbitrarily or selectively enforced code requirements. Plaintiffs have argued that several events show a lack of evenhandedness. In particular, plaintiffs point to a Denver Broncos motorcade on January 7, 1978, celebrating the Broncos' victory in the post-season play-offs. In response to plaintiffs' argument that this event was exempted from the code's requirements, defendants introduced evidence showing that the defendant officials did not believe that a "motorcade" was within the scope of those requirements. However artful that might appear, defendant officials did effect an amendment to the ordinance so that motorcades are now expressly included. Plaintiffs have also argued that a group of Iranians were allowed to demonstrate in the downtown area without a permit, but the evidence shows that this activity consisted of small groups of pedestrians who remained on the sidewalks and did not obstruct traffic. Thus, the activity did not require that a permit be granted. The evidence does not establish that plaintiffs have been victims of arbitrary enforcement.[2]

### III

■ In relevant part, the First Amendment recognizes and protects "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[3] While the scope of the First Amendment's protection has only recently been extended to "commercial speech," *see Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), it

has always been beyond question that protection of political expression was at the very heart of the Amendment's purpose. *See, e. g., Buckley v. Valeo,* 425 U.S. 1, 14–15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1975); *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); and *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

In addition to its clear political character, plaintiffs' activity involves one of the most well-established First Amendment forums—the public street. As stated by Justice Roberts in the leading case of *Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939):

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views . . . may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

Recent Supreme Court decisions continue to recognize this central proposition. While the Court in *Greer v. Spock* denied access to a military base, for use as a public forum, it nonetheless recognized "the long-established constitutional rule that there cannot be a blanket exclusion of First Amendment activity from a municipality's open streets, sidewalks, and parks . . . ." 424 U.S.

---

2. The same is true regarding plaintiffs' arguments that they have been the victims of a conspiracy to deprive them of their First Amendment rights. There is no evidence of any intent behind the relevant sections of the code to deprive them of such rights or of any bad faith in the code's enforcement. There is

no evidence of a conspiracy on the part of defendants.

3. The First Amendment is applicable to states by way of the Fourteenth Amendment. *See, e. g., Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

828, 835, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976). In *Lloyd Corporation v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), the Court faced for the second time the question whether a shopping center constitutes a public forum. Discussing its earlier decision in *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), the court commented that "the answer would be clear 'if the shopping center premises were not privately owned but instead constituted the business area of a municipality.'" *Id.* 407 U.S. at 559, 92 S.Ct. at 2224. Thus, in those situations where the court has denied the use of certain locations as a public forum, it has consistently stressed the constitutional rule that the public streets must be made available.

■ Within the ambit of this rule, it is nonetheless established that governments may enact reasonable time, place and manner regulations, so long as such are justified without reference to the content of the regulated speech and serve a significant governmental interest without unnecessarily infringing on First Amendment interests. *See, e. g., Buckley v. Valeo, supra*, 425 U.S. at 18, 96 S.Ct. 612; *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); and *Cox v. Louisiana*, 379 U.S. 536, 554- 55, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Such regulations must be narrowly and specifically drawn so that they neither brush too broadly nor spill too much discretion in their enforcement. *See, e. g., Hynes v. Mayor and Council of the City of Oradell*, 425 U.S. 610, 616–22, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Police Department of Chicago v. Mosely*, 408 U.S. 92, 98–102, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); and *NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964).

The question presented is one framed by Justice Frankfurter in *Niemotko v. Maryland*, 340 U.S. 268, 276, 71 S.Ct. 325, 95 L.Ed. 267 (1951); viz, "how to reconcile the interest in allowing free expression of ideas in public places with the protection of the public peace and of the primary uses of streets and parks." Stated more specifically, "the question in [each] particular case is whether [government] control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).

■ First Amendment claims must always be adjudicated in light of the special characteristics of the environment involved in the particular case. *See, e. g., Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). While parades and marches are not as strictly insulated from regulation as so-called "pure speech," they nonetheless receive significant constitutional protection as an established form of First Amendment expression. *See, e. g., Gregory v. Chicago*, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). Since the decision in *Cox v. New Hampshire, supra*, it has also been clear, however, that a reasonable permit or licensing system is one way in which a government may regulate the use of its streets for First Amendment purposes. Still, such a system of prior restraint,[4] while not unconstitutional *per se*, " 'comes to [a] Court bearing a heavy presumption against its constitutional validity.' " *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) and other cases cited there).

■ Consideration of a speaker's intended audience is relevant to questions regarding a public forum. In *Wolin v. Port of*

4. A system of prior restraint is any scheme which "[gives] public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975). One of the exceptions to the doctrine of prior restraint is the valid regulation of an activity's time, place, or manner, so long as that regulation meets those requirements which have been generally described above.

*New York Authority,* 392 F.2d 83 (2nd Cir. 1968), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968), where the terminal authority had consistently denied all access to those seeking a public forum, the court said:

> The propriety of a place for use as a public forum does turn on the relevance of the premises to the protest, but this relation may be found in two ways. In some situations the place represents the object of protest, the seat of authority against which the protest is directed. . . . In other situations, the place is where the relevant audience may be found. Here, the plaintiff is attempting to communicate his antiwar protest to the general public and to a special audience— servicemen traveling to and from their bases, particularly buses arriving from Fort Dix. The public is there, more than 200,000 persons a day, and it is likely that the concourse areas are more appropriate for the proposed activity than a narrow sidewalk. And servicemen on leave are in the terminal also in great numbers.

*Id.* at 90 (citations omitted). Upon finding that the terminal was an appropriate public forum, the Court held "that a flat prohibition on distribution of leaflets in a place appropriate for political expression cannot stand." *Id.* at 92. Here the downtown area is certainly an appropriate public forum from which First Amendment activity cannot be wholly barred. That location is relevant in both of those respects which the Court of Appeals noted above. First, downtown Denver is both the seat of state and local government and the focal point of the state's commercial interests. As such, it is the natural location for plaintiffs to voice their concerns and to petition the government for redress. Government and busi- ness may very well be those social forces which plaintiffs believe most responsible for the injustice that they feel. Second, and closely related, downtown, during workday hours, is where plaintiffs' relevant audience can be found.[5] Like the plaintiff in *Wolin, supra,* plaintiffs cannot be prohibited from reaching that audience in the peaceful and organized manner demonstrated here.

A recent decision in the Northern District of Illinois is particularly supportive of the result reached here. In *Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago,* 419 F.Supp. 667 (N.D.Ill.1976), a nonprofit corporation advocating world peace in general and the concerns of black people in particular, sought to conduct a march along a certain route through Chicago. Like the present case, the Chicago municipal code prohibited all parades or assemblies on any public street unless a permit was first obtained from a designated city official. Seeking to demonstrate against certain recent events in the area surrounding Marquette Park, a predominantly white residential area into which a few black families had moved, plaintiffs applied for a permit to conduct a march to that area. The application was denied because it was felt "that the proposed event would inconvenience a large number of the traveling public" and "require the Police Department to supply a large amount of personnel . . . ." *Id.* at 671. Following this denial, plaintiffs filed a suit alleging infringement of their constitutional rights and obtained preliminary relief which allowed them to conduct the march. Ten days after the march, which had resulted in a considerable disturbance for which plaintiffs were not at fault, they applied for a permit to conduct a second march. The city proposed an alter-

---

5. Not only is the population simply not there after 6:00 p. m., but the intended audience which plaintiffs are trying to reach has vanished to suburbia. In demonstrating Chicano concerns and petitioning for a redress of grievances, plaintiffs seek to communicate their cause to those who work and hold positions of influence precisely where the parade is proscribed. Plaintiffs are not required to conduct their peaceful demonstration on abandoned streets. The same reasons make the regula- tion's restriction to 14th and 15th Streets unreasonable. A distance of only several blocks may make a world of difference in a central city, and that is the case here. These streets are substantially removed from the relevant audience which plaintiffs are attempting to reach. Confinement to those streets, which run through an area which is considerably less populated than that surrounding 16th and 17th, would seriously blunt the impact of plaintiffs' petition.

nate route which plaintiffs rejected, and suit was again filed. In holding that plaintiffs had been wrongfully denied a permit, Judge Leighton discussed the same audience question that is at issue here.

Plaintiffs and their supporters had expressed the desire to proclaim in Marquette Park their protest against events which in their opinion had deprived Negro citizens of their constitutional rights. *The audience they wanted for dissemination of their views was one composed of Caucasians, people who lived in the Marquette Park area.* Plaintiffs wanted to call their dissatisfaction to the attention of those people, solicit their support, and bring action from the public authorities. They had a constitutionally protected right to do this. *Baines v. City of Danville,* 337 F.2d 579 (4th Cir. 1964). And no one questions the fact that this purpose was legal and that plaintiffs were pursuing it in a lawful and peaceable manner.

*The proposed alternate route was one* by which plaintiffs had to proceed, not south on Ashland Avenue then west on 71st Street to Marquette Park where they believed there was an audience to which they could effectively express their views; it was north on Ashland to 59th Street and east to Lindbloom Park *where the audience would be Negroes, people who needed no persuasion* to the views plaintiffs had concerning events near Marquette Park. The alternate route, then was the suggestion of a forum that had the effect of depriving plaintiffs of their First Amendment rights. *Collin v. Chicago Park District,* 460 F.2d 746 (7th Cir. 1972).

*Id.* at 673–74 (emphasis added). This reasoning is both persuasive and supportive. The "alternate" times and places which the

Denver municipal code afford to plaintiffs for conducting their peaceful demonstration has the effect of depriving them of their First Amendment rights.[6]

■ As stated generally above, blanket prohibitions of otherwise protected First Amendment activity are unconstitutional and void. *See, e. g., Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (reversing conviction under law prohibiting "nearly every practicable, effective means" of expression in the vicinity of a labor dispute); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (voiding an ordinance outlawing all distribution of handbills on public streets without a license); *Philadelphia Newspapers v. Borough Council, et al.,* 381 F.Supp. 228 (E.D. Pa.1974) (invalidating a total prohibition of newspaper boxes on public sidewalks); and *Washington Free Community, Inc. v. Wilson,* 334 F.Supp. 77 (D.D.C.1971), aff'd, 157 U.S.App.D.C. 360, 484 F.2d 1078 (1973) (voiding a Park Service regulation prohibiting the unlicensed sale of newspapers in park areas). In *Barnett v. D'Artois,* 331 F.Supp. 1810 (W.D.La.1971), a city ordinance absolutely prohibited any political speech or assembly in the city's park. In striking down that ordinance as an overly broad infringement of First Amendment activity, the district court looked to the general constitutional rule:

As the Supreme Court has pointed out, even though there may be a legitimate and substantial governmental interest, that interest may not be pursued by means that broadly stifle fundamental personal liberties when the end may be more narrowly achieved. Consequently, we hold that the Ordinance is facially unconstitutional . . . .

---

**6.** For other cases where the audience question has been addressed, *see Albany Welfare Rights Organization v. Wyman,* 493 F.2d 1319 (2nd Cir. 1974), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (welfare office an appropriate forum for First Amendment activity involving welfare rights); *International Society for Krishna Consciousness v. Griffin,* 437 F.Supp. 666 (W.D.Pa.1977) (airport ordinance overly broad in preventing plaintiffs from

reaching their intended audience); *Moskowitz v. Cullman,* 432 F.Supp. 1263 (D.N.J.1977) (political candidate must be allowed to distribute handbills during commuter period at train terminal, despite alleged interference with traffic movement); and *Unemployed Workers Union v. Hackett,* 332 F.Supp. 1372 (D.R.I.1971) (unemployment office is where plaintiffs could find their appropriate audience).

*Id.* at 1317. Because § 332.5–2 produces an impermissible prohibition of First Amendment expression, it is constitutionally defective.

 While no alternative forum has been suggested in this case, the possibility of such is not an adequate answer to plaintiffs' claims. As the Supreme Court recently stated in *Southeastern Promotions, Ltd. v. Conrad, supra,* " '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' *Schneider v. State,* 308 U.S., at 163[, 60 S.Ct. 146, 84 L.Ed. 155]." *Id.* 420 U.S. at 556, 95 S.Ct. at 1245. The probable alternative invited by § 332.5–2's total prohibition of effective First Amendment speech is other and possibly disorderly attempts to convey plaintiffs' message. As the Court of Appeals said in *Wolin, supra,* "[W]e should . . . be mindful that to the extent we secure legitimate and orderly access to means of communication for all views, we create conditions in which there is no incentive to resort to more disruptive conduct." *Id.* at 93.

While the effect of this decision renders the existing regulation at § 332.5–2 of the municipal code void, it is not, of course, intended to suggest that Denver may not enact reasonable time, place, and manner regulations which narrowly serve the legitimate interests of traffic control and public order. For guidance in this area, defendants may wish to review *National Socialist Party of America v. Village of Skokie,* 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977), and *Southeastern Promotions, Ltd. v. Conrad, supra.*

Because of the doctrines arising in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and subsequent cases, plaintiffs' request for a permanent injunction is denied. In addition, the court does not find that plaintiffs have made an adequate showing in support of their claim for damages. The court does, however, expressly declare that Section 332.5–2 of the Revised Municipal Code of the City and County of Denver is void and of no effect, as an overly broad and excessive infringement of First Amendment rights. Absent

the present restrictions regarding time and place, defendants may require plaintiffs and others to obtain permits which do not effect incursions into areas protected by the First Amendment. In fact, it remains the duty of defendants to protect plaintiffs in the exercise of these rights. *Hague v. CIO, supra.* Fair and reasonable regulations directed to that end are prudent, if not required. Accordingly,

IT IS ORDERED, ADJUDGED AND DECREED as follows:

1. Plaintiffs' complaint for permanent injunction is denied.

2. Plaintiffs' complaint for damages is denied.

3. Plaintiffs' complaint for declaratory judgment is granted.

4. Each party shall bear his, her or its own costs.